UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**JOHN C. BUCHANAN, JR.**,

          Plaintiff,

                              No. 2:12-cv-15511

vs.                             Hon. Gerald E. Rosen

**JAMES W. METZ II** and **DONOVAN MOTLEY**,

          Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANT METZ'S MOTION TO DISMISS

### I. INTRODUCTION

This civil rights litigation arises out of Plaintiff John C. Buchanan, Jr.'s involvement in attempting to redevelop a manufacturing plant into a film studio as part of Michigan's Film and Digital Media Tax Credit program. According to Plaintiff, the project ultimately fell through due to a politically-motivated criminal investigation by the Michigan Attorney General. Defendants James W. Metz II and Donovan Motley handled the investigation. Their investigation ultimately resulted in criminal charges against Plaintiff and another individual, which a Michigan state court subsequently dismissed for want of probable cause. Plaintiff now seeks relief in this Court, asserting causes of action under the Fourth

1

Amendment and Michigan common law for malicious prosecution and false arrest. In short, Plaintiff complains that Metz and Motley decided to pursue charges against Plaintiff without probable cause and effectuated this by having Motley make false statements to a magistrate.

Metz has now moved to dismiss Plaintiff's Amended Complaint on the grounds that it fails to state a claim under Rule 12(b)(6), or, in the alternative, that he enjoys absolute or qualified immunity. Having reviewed and considered Metz's Motion and supporting brief, Plaintiff's response thereto, supplemental briefing, and the entire record of this matter, the Court has determined that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Therefore, the Court will decide this matter "on the briefs." See Eastern District of Michigan Local Rule 7.1(f)(2). The Court's Opinion and Order is set forth below.

## II. PERTINENT FACTS

### A.    Michigan's Film and Digital Media Tax Credit

The origins of this matter arise out of the State of Michigan's tax incentives for the film industry. As pertinent here, the "Film and Digital Media Tax Credit" permits investors to claim a tax credit "for an investment in a qualified film and digital media infrastructure project . . . equal to 25% of the taxpayer's base

investment."  M.C.L. § 208.1457(1-2) (effective April 8, 2008).[1]  The Michigan Film Office oversees the issuance of these credits, with the concurrence of Michigan's Treasurer.  § 208.1457(1).  A "qualified film and digital media infrastructure project" includes production and postproduction facilities, property and equipment related to the facility, and "any other facility that is a necessary component of the primary facility."  § 208.1457(11)(d).  Finally, the tax credit defines a "base investment" as:

> [T]he cost, including fabrication and installation, paid or accrued in the taxable year of tangible assets of a type that are, or under the internal revenue code will become, eligible for depreciation, amortization, or accelerated capital cost recovery for federal income tax purposes, provided that the assets are physically located in this state for use in a business activity in this state and are not mobile tangible assets expended by a person in the development of a qualified film and digital media infrastructure project.  Base investment does not include a direct production expenditure or qualified personnel expenditure eligible for a credit under [a different provision of Michigan's film incentive, § 208.1455].

§ 208.1457(11)(a).

## B.    The Development of the Lear Plant into a Film Production Facility

### 1.    Alpinist and West Michigan Films Agree To Redevelop the Lear Plant

Alpinist Endeavors, LLC was a limited liability company co-owned by Plaintiff and his father.  (Plf's Am. Compl., Dkt. # 18, at ¶ 9).  It owned a former

---

[1] After the events at issue in this lawsuit, Michigan significantly changed its film industry tax credit program.

manufacturing plant just outside of Grand Rapids commonly known as the "Lear Plant" or "Hangar 42." (*Id.* at ¶¶ 10, 46). Recognizing that the large Lear Plant might have potential as a film production facility, Plaintiff began working with an investor, West Michigan Films, to redevelop the Lear Plant into a permanent film studio. (*Id.* at ¶¶ 15-21). West Michigan Films, Alpinist, Plaintiff, and Plaintiff's father eventually reached two agreements to effectuate this redevelopment.

First, West Michigan Films agreed to purchase portions of the Lear Plant from Alpinist for $40 million on a land contract. (*Id.* at ¶ 21(a)). West Michigan Films' purchase was contingent upon two things: (1) Alpinist making certain improvements to allow the facility to be used as a film studio; and (2) West Michigan Films qualifying for a $10 million infrastructure tax credit. (*Id.*). Indeed, the infrastructure tax credit was the linchpin to the purchase agreement; it provided West Michigan Films with the necessary capital to be used for its down payment to Alpinist:

> West Michigan Films intended to sell the infrastructure tax credit to an assignee, and use part of the proceeds to make a down payment to Alpinist. The land contract would require no payments for the first year; but would require West Michigan Films to pay a percentage of revenue each year until fully paid. Thus, without the infrastructure tax credit, the deal would not be done.

(*Id.*). Alpinist made the improvements and the parties eventually closed on this land contract on April 5, 2010, in escrow, pending the issuance of the infrastructure tax credit. (*Id.* at ¶¶ 21(a), 71).

4

Second, Plaintiff entered into a separate agreement with his father concerning his father's stake in Alpinist. Specifically, Plaintiff's father agreed to transfer his interest in Alpinist to Plaintiff "for over $800,000 and other consideration (amounting to over $3 million). This agreement, which specifically referenced the anticipated sale of [the portions of the Lear Plant] to West Michigan Film[s] and gave Plaintiff clear title to the entire assets of Alpinist, was signed and put into escrow to be closed no later than February 15, 2010." (*Id.* at ¶ 21(b)).

### 2.    The Redevelopment Plan Falls Apart

Pursuant to its agreement with Alpinist, West Michigan Films began working with the Michigan Economic Development Corporation (MEDC) and the Michigan Film Office to put together a business plan that would meet state approval for the infrastructure tax credit. (*Id.* at ¶ 27). Ultimately, in November 2009, the MEDC, the Michigan Film Office, and the Treasurer approved West Michigan Films' application for the tax credit. (*Id.* at ¶¶ 30, 34). In so approving, the MEDC and the Michigan Film Office knew that the base investment claimed on the Lear Plant was $40 million. (*Id.* at ¶¶ 29, 31).

The redevelopment plan, however, fell apart, culminating with the Film Office's decision to not finalize the tax credit -- declining to issue the "Infrastructure Expenditure Credit certificate" -- on May 23, 2010. (*Id.* at ¶ 79). Plaintiff asserts that the project's downfall began when "politics intervened." (*Id.*

at ¶ 37).  Specifically, various individuals and organizations began questioning the veracity of the project's $40 million base investment price, when it had previously been listed for sale a few months before for less than $10 million and had not undergone $30 million in improvements.  (*Id.* at ¶¶ 52, 77, 94).  The claimed base investment price, according to these individuals and organizations, "was inflated purely to get the tax credit."  (*Id.* at ¶ 52).

**C.     Plaintiff's Arrest and Prosecution**

Needless to say, this situation received significant media and public attention.  (*Id.* at ¶¶ 46, 47, 50, 61, 81-83).  For example, one individual with close ties to media in Grand Rapids sent at least one "whistleblower email" asserting that the project was a fraud to state legislators and various advocacy groups opposing tax credits.  (*Id.* at ¶ 45).  The election-cycle, and more specifically, the Republican primary for governor in the summer of 2010, magnified this attention.  Then-gubernatorial candidate Representative Pete Hoekstra called for a criminal investigation into the matter.  (*Id.* at ¶ 85).  One of Representative Hoekstra's opponents in the upcoming Republican gubernatorial primary was then-Attorney General Mike Cox.  Individuals in the Michigan Film Office characterized Representative Hoekstra's call for an investigation as "a political ploy . . . to make . . . Attorney General Cox . . . either investigate or seem soft on fraud."  (*Id.* at ¶ 87).  By June 16, 2010, the Attorney General had launched such an investigation.

6

(*Id.* at ¶ 84).   Metz was the Assistant Attorney General assigned to the investigation and Motley was the investigator.  (*Id.* at ¶¶ 88-89).

On August 2, 2010, the day before the Republican gubernatorial primary, the Attorney General's Office announced that it was filing criminal charges against Joe Peters, West Michigan Films' principal, for attempted fraud on the state.  (*Id.* at ¶ 91).  Five months later, on January 25, 2011, Motley appeared before a magistrate, presented a sworn affidavit with facts uncovered during the investigation, and requested a warrant for Plaintiff's arrest on similar charges.  (*Id.* at ¶¶ 92, 102). The magistrate granted this request.  (*Id.* at ¶ 92).  After Plaintiff's booking and subsequent release on bond, the state district court held preliminary examinations in May, July, and September 2011, and eventually dismissed the charges against Plaintiff and Peters for lack of probable cause.  (*Id.* at ¶¶ 103-05).

## D.    Plaintiff's Claims

The crux of this case deals not with the reason for and propriety of the state's ultimate denial of the tax credit.  Nor does it deal with Plaintiff's failure to ultimately convert the Lear Plant into a functioning film studio.  Rather, Plaintiff alleges misconduct arising out of the politically-motivated prosecution that Defendants spearheaded.

### 1.      The Problems with Motley's Affidavit

Plaintiff claims that Motley presented untrue statements to the magistrate, which were "material to the issuance of the arrest warrant." (*Id.* at ¶ 101). First, the affidavit provided that "Plaintiff arranged for an appraisal in which he suggested and insisted that the appraiser value the facility in excess of $40 million[] and that the appraisal relied in part upon the $40 million sales price as part of the rationale for the final opinion of value." (*Id.* at ¶ 94). Such statements were false because "the appraiser had given a sworn, stenographically-recorded statement before Defendant Metz . . . and Defendant Motley . . . . stat[ing] that he did not rely on the sales price, but rather on the cost to replace the facility as a film studio." (*Id.* at ¶ 95). In short, "he stated that the value of the building for [use as a film studio] was higher than its value for general industrial use." (*Id.*). The appraiser also "specially denied that his number was the result of any influence by plaintiff." (*Id.*).

Second, it "falsely suggested that Mr. Buchanan had a CPA falsify the transaction by stating that the property had been sold." (*Id.* at ¶ 96). This was false because the CPA had also given a sworn and recorded statement to Metz and Motley that Joe Peters had "asked him to send the Film Office [a] letter regarding the sale of the facility to West Michigan Films" and that he "had reviewed the

8

closing papers and considered the property sold, but in escrow pending the [issuance of the infrastructure tax credit]." (*Id.* at ¶ 97).

Third, the affidavit claimed "that there was no intent to sell because Mr. Buchanan did not have the ability to transfer title." (*Id.* at ¶ 98). Metz and Motley "knew that this statement was false and misleading because they had in their possession at the time the agreements and e-mails among Mr. Buchanan, his father, and Alpinist's attorney." (*Id.* at ¶ 99). Those documents showed "that while Mr. Buchanan's father was Alpinist's Manager with sole authority to sell the property, he had agreed to the deal if it could be closed, had agreed to sell his entire interest to Mr. Buchanan, and had had Alpinist's attorney work diligently to get the sale to West Michigan Films to closure." (*Id.*)

Fourth, the "totality of the affidavit suggested a scheme in which the property would never change hands, but the tax credit would be pocketed." (*Id.* at ¶ 100). "Evidence in [Metz and Motley's] possession at the time of the affidavit, however, demonstrated that Alpinist, Mr. Buchanan, and West Michigan Films intended that the property would change hands once the certificate of the infrastructure tax credit was received." (*Id.*).

## 2.    Metz's Involvement

As pertinent to Metz's instant Motion, Plaintiff sets forth the following facts concerning Metz's actions:

9

90.    [Metz (along with Motley)] gathered documents from various persons, and conducted both unrecorded and stenographically recorded statements from various people.

* * *

111.   The defendant James Metz was actively involved in the investigatory phase of the proceedings ultimately leading to the prosecution of the plaintiff[.]

112.   Upon information and belief, based in part on documents already in the plaintiff's possession, Mr. Metz's functions in the course of that process included or may have included:

    a.    Determining, independently and in conjunction with the defendant Motley, the witnesses and potential witnesses who would be contacted and interviewed;

    b.    planning the questioning for persons interviewed in the course of the investigation;

    c.    conducting critical interviews of the key witnesses who provided testimony directly contrary to that which was offered to the District Court judge at the time the warrant was issued;

    d.    observing interviews of other witnesses;

    e.    examining documents obtained;

113.   In addition to his role in the foregoing investigatory functions, upon information and belief, the defendant Metz also may have given advice to the defendant Motley concerning how the investigation that (sic) was to be pursued and further gave advice to Motley and others as to the propriety of the arrest of plaintiff.

114.   These functions were separate and distinct from his prosecutorial functions which may have included making

determinations as to the appropriateness of charging plaintiff and preparing paperwork for submission to the Court.

115. It is believed that both defendants Motley and Metz were fully aware that the investigation was incomplete, that important exculpatory evidence was being consciously ignored, such as the existence of the land contract between Alpinist, LLC and West Michigan Film, LLC, as well as escrow agreements incident thereto.

116. Upon information and belief, defendant Metz was also:

   a.   aware of the plaintiffs desire to disclose the true facts of the transactions involved with Hangar 42 and the application for tax credits so as to avoid an unwarranted and unfounded prosecution;

   b.   made or participated in the decision to avoid speaking with plaintiff to obtain additional facts necessary to [make] an informed decision to prosecute.

117. Had the investigation been performed in good faith and in a legitimate attempt to uncover the truth, the prosecution never would have been initiated.

118. Defendant Metz may also have conspired with Defendant Motley to provide false information to the Court at that (sic) time of the issuance of the warrant for plaintiff's arrest.

(*Id.* at ¶¶ 90, 111-18).

Accordingly, Plaintiff asserts that Metz is liable for malicious prosecution under the Fourth Amendment and Michigan common law.[2]  Metz has now moved

---

[2] Plaintiff's Amended Complaint also asserts false arrest in violation of the Fourth Amendment and Michigan common law.   Though somewhat inconsistent, Plaintiff's Response makes clear that he is not seeking to hold Metz liable for false arrest.  (Plf's Resp., Dkt. # 26, at 2) ("den[ying] that Plaintiff claim[s] false arrest

to dismiss Plaintiff's Complaint on the grounds that it fails to state a claim under Rule 12(b)(6), or, in the alternative, that he enjoys absolute or qualified immunity. As set forth below, the Court GRANTS Metz's Motion.

## III. DISCUSSION

### A.    Standard of Review

In deciding a motion brought under Rule 12(b)(6), the Court must construe the complaint in the light most favorable to Plaintiffs and accept all well-pled factual allegations as true. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).   To withstand a motion to dismiss, however, a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Contrary to Plaintiff's assertion that the old "no set of facts" standard applies to Rule 12(b)(6) motions (Plf's Resp., Dkt. # 26, at 9), the Supreme Court made clear in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), that it "retired" that standard. *Id.* at 670.  Rather, the factual allegations in the complaint, accepted as true, "must be enough to raise a right to relief above the speculative level," and must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual

---

against Mr. Metz"); (*but see id.* at 4, 8, 14).  Even if this were not the case, the Court's conclusion below concerning absolute immunity would apply equally to a false arrest claim.

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for defendant's conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013).

The Sixth Circuit has emphasized that the "combined effect of *Twombly* and *Iqbal* [is to] require [a] plaintiff to have a greater knowledge . . . of factual details in order to draft a 'plausible complaint.'" *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (citation omitted). Put another way, complaints must contain "plausible statements as to when, where, in what or by whom," *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 373 (6th Cir. 2011), in order to avoid merely pleading an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

## B.    Analysis

### 1.    Eleventh Amendment Immunity

Though Metz does not assert that the Eleventh Amendment bars Plaintiff's claims, the Court is inclined to briefly discuss its applicability because "the question of sovereign immunity . . . implicates important questions of federal-court jurisdiction and federal state comity.'" *Cady v. Arenac Cnty.*, 574 F.3d 334, 344 (6th Cir. 2009) (citation omitted); *Mixon v. Ohio*, 193 F.3d 389, 397 (6th Cir.

1999) (a federal court "may sua sponte raise the issue of lack of jurisdiction because of the applicability of the eleventh amendment"). Because Defendants are state officials, any suit for monetary damages in their official capacity is deemed to be an action against the state of Michigan and therefore subject to dismissal under the Eleventh Amendment. *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004).

A plaintiff seeking relief under 42 U.S.C. § 1983 "must clearly notify any defendant[] of [his] intent to seek individual liability." *Moore v. City of Harriman*, 272 F.3d 769, 775 (6th Cir. 2001). In this case, Plaintiff has not specifically designated the capacity in which he is suing the Defendants. Under the Sixth Circuit's "course of proceedings" test, however, a plaintiff who does not affirmatively plead individual capacity may otherwise put a defendant on notice of an individual capacity suit. *Id.* at 772-74. This test "considers such factors as the nature of the plaintiff's claims, *requests for compensatory or punitive damages*, and the nature of any defenses raised in response to the complaint, *particularly claims of qualified immunity*, to determine whether the defendant had actual knowledge of the potential for individual liability." *Id.* at 772 n. 1 (emphasis added). Here, though Plaintiff did not affirmatively plead that he is suing Defendants in their individual capacities, his prayer for monetary damages *plus* Metz's assertion of the qualified immunity defense indicates that Metz was aware

14

of potential liability in his individual capacity. *Garcia v. Dykstra*, 260 F. App'x 887, 895 (6th Cir. 2008) (state actors were "on notice of the possibility of an individual capacity § 1983 claim" due to the plaintiff's "demand for money damages" and the defendants' assertion of qualified immunity as an affirmative defense); *Lindsay v. Bogle*, 92 F. App'x 165, 169 (6th Cir. 2004) ("Although a request for monetary damages alone may not suffice to establish the requisite notice, the assertion of a qualified-immunity defense (even a *contingent* qualified-immunity defense) indicates that the defendants were aware they could be held personally liable.") (internal citations omitted). Accordingly, this Court finds that Plaintiff has sued Metz in his individual capacity to which Eleventh Amendment immunity does not apply.

### 2.   Absolute Immunity

"State prosecutors are absolutely immune from civil liability when acting within the scope of their prosecutorial duties." *Howell v. Sanders*, 668 F.3d 344, 349 (6th Cir. 2012) (citing *Imbler v. Pachtman*, 424 U.S. 409 (1976)).[3] "[T]he

---

[3] As Metz points out and Plaintiff does not contest, Michigan law governing prosecutorial immunity substantially mirrors the *Imbler* standard. *See, e.g, Cheolas v. City of Harper Woods*, 2009 WL 388548, at *9 (E.D. Mich. Feb. 13, 2009) (Rosen, C.J.) (citing *Payton v. Wayne Cnty.*, 137 Mich. App. 361 (1984) and *Davis v. Eddie*, 130 Mich. App. 284 (1983)); *but see Wendrow v. Mich. Dept. of Human Servs.*, 534 F. App'x 516, 534 n.2 (6th Cir. 2013) (questioning but not deciding "whether Michigan's 1986 governmental-immunity statute eliminated the common-law immunity that Michigan previously afforded to lower-level

official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991). Prosecutorial immunity flows from the common-law and "is based upon the same considerations that underlie the common-law immunities of judges and gran[d] jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler*, 424 U.S. at 422-23. "Although absolute immunity 'leave[s] the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty,' 'the broader public interest' would be disserved if defendants could retaliate against prosecutors who were doing their duties." *Adams v. Hanson*, 656 F.3d 397, 401-02 (6th Cir. 2011) (alteration in original) (citing *Imbler*).

The key to determining whether a prosecutor is entitled to absolute immunity requires analyzing whether the prosecutor's alleged activities "were intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. If so, then a prosecutor is absolutely immune from liability, even for egregious conduct such as "the knowing use of false testimony and the suppression

---

prosecutors for their quasi-judicial actions"). Accordingly, Defendant's immunity arguments rise and fall with federal law.

of material evidence at [a] criminal trial." *Spurlock v. Thompson*, 330 F.3d 791, 797 (6th Cir. 2003) (*citing Imbler*).   There are limits to this broad rule.   "[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Instead, courts are to apply a "'functional approach,' which looks at 'the nature of the function performed, not the identity of the actor who performed it.'" *Id.* at 269 (internal citation omitted).   "[T]he critical inquiry is how closely related is the prosecutor's challenged activity to his *role as an advocate* intimately associated with the judicial phase of the criminal process." *Spurlock,* 330 F.3d at 798. (internal quotation marks and citation omitted).

In *Buckley*, for example, the Supreme Court focused on the distinction between a prosecutor's "investigative" and "judicial" acts:

> A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity.   We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity.   Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.
>
> * * *
>
> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the

17

one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he "has no greater claim to complete immunity than activities of police officers allegedly acting under his direction."

509 U.S. at 273-74 (internal citations omitted). The *Buckley* Court also rejected the notion that a prosecutor may "shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial." *Id.* at 276. Accepting such an argument would mean that "every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." *Id.* Applying this reasoning, the Supreme Court held that absolute immunity did not apply to a prosecutor's investigation done in part to establish probable cause, as well as to statements made to the press. *Id.* at 274-77.

"The line between conduct that is part of a preliminary investigation and conduct that is intimately associated with the judicial phase of a criminal proceeding is difficult to draw in some cases." *Prince v. Hicks*, 198 F.3d 607, 612 (6th Cir. 1999). Despite Plaintiff's assertion to the contrary (Plf's Resp., Dkt. # 26, at 15-16), "[t]he dividing line" between these acts "is not . . . the point of

18

determination of probable cause.  Instead, the dividing line is the point at which the prosecutor performs functions that are intimately associated with the judicial phase of the criminal process."  *Prince*, 198 F.3d at 614.[4]  As applicable to the case at bar, the Sixth Circuit helped further refine this distinction in *Ireland v. Tunis*, 113 F.3d 1435 (6th Cir. 1997), and *Prince v. Hicks*, 198 F.3d 607 (1999).

In *Ireland*, the Sixth Circuit clarified that "[i]nvestigative acts undertaken in direct preparation of judicial proceedings, including the professional evaluation of evidence, warrant absolute immunity, whereas other acts, such as the preliminary gathering of evidence that may ripen into a prosecution, are too attenuated to the judicial process to afford absolute protection."  113 F.3d at 1445.  This includes "a prosecutor's decision to file a criminal complaint and seek an arrest warrant and the presentation of these materials to a judicial officer."  *Id.* at 1445.  "In this role," continued the Sixth Circuit, "a prosecutor is unquestionably functioning as an

---

[4] In *Prince*, the Sixth Circuit discussed the Supreme Court's language in *Buckley* that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."  *Id.* at 614 (citing *Buckley,* 509 U.S. at 274).  This quote, without context, appears to draw the bright line Plaintiff so articulates.  As the Sixth Circuit explained in *Prince*, however, "[a] footnote in *Buckley* following the above-quoted sentence clarifies a point that [Plaintiff] fails to recognize.  A prosecutor performing an investigative function before she has probable cause to arrest a suspect cannot expect to receive the protection of absolute immunity, but a prosecutor who initiates criminal proceedings against a suspect whom she had no probable cause to prosecute is protected by absolute immunity."  *Id.*; *see also Gregory v. City of Louisville*, 444 F.3d 725, 740 (6th Cir. 2006) ("The *Buckley* Court dismissed the argument that probable cause was a dividing line for potential liability attendant to prosecutors' actions.").

advocate for the state in the judicial process, and absolute immunity is fully justified because the integrity of the judicial system depends in large part upon a prosecutor's ability to exercise independent judgment in deciding whether and against whom to bring criminal charges." *Id.* This also includes "administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution." *Id.* at 1447. But, "not all investigative acts undertaken by a prosecutor will be absolutely protected. Conducting a preliminary investigation is generally removed from a prosecutor's role in a judicial proceeding; 'such investigations take place outside the adversarial arena with its attendant safeguards that provide real and immediate checks to abusive practices.'" *Id.* at 1447 n.7. (citation omitted).

Applying these principles to the prosecutors' actions (an alleged involvement in bringing politically motivated criminal charges), the Sixth Circuit held in *Ireland* that they were "entitled to absolute prosecutorial immunity for deciding to file a criminal complaint against [the plaintiff], authorizing and preparing the complaint, seeking a warrant for her arrest, and . . . presenting the charging documents to the judge [because t]hese were advocacy functions intimately associated with the judicial phase of the criminal process." *Id.* at 1447. Importantly, and in contrast to Plaintiff's allegations regarding Metz's role here, the plaintiff in *Ireland* did not "contend that her alleged constitutional deprivation

20

arose from the prosecutors' investigative activities undertaken antecedent to the decision to file criminal charges." *Id.*

A few years later, the Sixth Circuit affirmed the denial of absolute immunity for a prosecutor's preliminary investigatory conduct and advice regarding the existence of probable cause in *Prince*. The underlying facts in *Prince* revolved around a custody dispute involving the plaintiff's grandson. 198 F.3d at 610. Plaintiff -- a vocal critic of the local District Attorney General -- agreed to take physical custody of her grandson while one of his parents entered a drug treatment program. *Id.* Upon the parents' demand for her to return their child, plaintiff sought an emergency protective custody order fearing that the parents would leave the state. *Id.* The parents then contacted the defendant, an Assistant District Attorney General, who eventually sought and received an arrest warrant for the plaintiff. *Id.*

After the charges were dropped, the plaintiff sought to hold the defendant liable for her "alleged investigation of, or failure to investigate adequately, criminal charges against [the plaintiff.]" *Id.* The plaintiff's allegations concerning the defendant's investigatory role were as follows:

> After the [the child's parents] contacted [the defendant], she and Defendant Hazelhurst, an Anderson County detective, undertook to perform an investigation of the circumstances surrounding the [parents'] complaints or, alternatively, performed no investigation or a grossly inadequate investigation. Prior to the establishment of any probable cause whatsoever for the arrest or charging of the Plaintiff

21

with a crime, the Defendants knew or should have known that the Plaintiff had applied for an emergency protective custody order with the Juvenile Court for Knox County, Tennessee, were aware or should have been aware of the circumstances surrounding Plaintiff's taking physical custody of the child and were aware or should have been aware that there was no probable or justifiable cause to believe Plaintiff had committed or was committing a crime.

*Id.* at 611.  Focusing "on the specific circumstances of the case" as alleged in the plaintiff's complaint, the Sixth Circuit affirmed the denial of absolute immunity because the "allegations refer to conduct that occurred while [the defendant] performed administrative and investigative functions that were not intimately associated with the judicial phase of the criminal proceedings."  *Id.* at 613.  The Sixth Circuit continued:

> In her amended complaint, [plaintiff] claims that [the defendant] engaged in unconstitutional conduct when she "undertook to perform an investigation of the circumstances surrounding [the daughter and son-in-law's] complaints or, alternatively, performed no investigation or a grossly inadequate investigation." Because [the defendant] has failed to meet her burden to show that the alleged investigation or failure to investigate was intimately associated with the judicial phase of the criminal process, the district court properly refused to dismiss the allegations contained in ¶ 13 of the amended complaint on absolute immunity grounds.

*Id.* (*citing Buckley,* 509 U.S. at 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.");

*Ireland,* 113 F.3d at 1447 n. 7 ("Conducting a preliminary investigation is generally removed from a prosecutor's role in a judicial proceeding; 'such investigations take place outside the adversarial arena with its attendant safeguards

22

that provide real and immediate checks to abusive practices.'")); s*ee also Heard v. City of Hazel Park*, 2012 WL 1867313, at *3 (E.D. Mich. May 22, 2012) (Cook, J) (similar); *Coopshaw v. Figurski*, 2008 WL 324103, at *6-11 (E.D. Mich. Feb. 6, 2008) (Borman, J.) (similar).

"Because '[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute,' [this Court] must identify precisely the wrongful acts allegedly performed by [Metz], and classify those acts according to their function." *Adams*, 656 F.3d at 403 (quoting *Burns*, 500 U.S. at 495). Here, Plaintiff's allegations concerning Metz can be broken down into three general functional categories: (a) participation in the investigation into the Lear Plant redevelopment deal; (b) giving advice regarding the investigation and the propriety of Plaintiff's arrest; and (c) initiating Plaintiff's prosecution. Each is addressed in turn.

### a.      Participation in the Investigation Into the Lear Plant Redevelopment Deal

The bulk of Plaintiff's facts concerning Metz land in this category, undoubtedly in an attempt to avoid absolute immunity.[5] Plaintiff alleges that Metz "gathered documents from various persons, and conducted both unrecorded and

---

[5] Plaintiff added these factual assertions as part of his Amended Complaint, apparently in response to a threatened motion to dismiss on prosecutorial immunity grounds.

stenographically recorded statements from various people." (Plf's Am. Compl., Dkt. # 18, at ¶ 90). More specifically, Metz engaged in the following "investigatory acts:"

- Determining, independently and in conjunction with the defendant Motley, the witnesses and potential witnesses who would be contacted and interviewed;
- Planning the questioning for persons interviewed in the course of the investigation;
- Conducting critical interviews of the key witnesses who provided testimony directly contrary to that which was offered to the District Court judge at the time the warrant was issued;
- Observing interviews of other witnesses; and
- Examining documents obtained.

(*Id.* at ¶ 112). Metz also "consciously ignored" "important exculpatory evidence," (*Id.* at ¶ 114), and "made or participated in the decision to avoid speaking with plaintiff" despite being aware of Plaintiff's desire to disclose information in order to avoid prosecution. (*Id.* at ¶ 116).

These factual allegations, taken as true, only relate to the investigative steps Metz took in concert with Motley before the magistrate's finding of probable cause and not to any other function. They are, therefore, not distinguishable from those in *Prince* and *Buckley* and mandate a finding that Metz is not entitled to absolute immunity for his participation in the investigation. Metz has failed to meet *his* burden to show that his investigation and/or lack of investigation "was intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at

24

430. Stated differently, he has failed to put forth evidence that his investigation was part and parcel with his advocacy function in preparation for a judicial proceeding and was not just done to assist in establishing probable cause. *Prince*, 198 F.3d at 613. And, that Plaintiff was charged with a crime does not retroactively convert Metz's role in the investigation into a prosecutorial function. *Buckley*, 509 U.S. at 275-76.

The Court does not take Metz's policy arguments as to why absolute immunity should apply lightly. Prosecutors are often involved with criminal investigations before probable cause determinations, but Metz's argument that "[d]enying absolute immunity in a case such as this would likely 'eviscerate' . . . absolute immunity" is overstated. (Def's Br., Dkt. # 23, at 15). It, in no uncertain terms, ignores the Supreme Court and Sixth Circuit's cautions to "*focus on the specific conduct at issue in a case* . . . [because] the absolute immunity question nonetheless turns on *the specific circumstances of the case*." *Prince*, 198 F.3d at 612 (citations omitted and emphasis added). Here, the specific circumstances relative to Metz's investigative function, as set forth above, dictate a finding of no absolute immunity.

### b. Giving Advice Regarding the Investigation and the Propriety of Plaintiff's Arrest

Plaintiff asserts, upon information and belief, that Metz "may have given advice to the defendant Motley concerning how the investigation that (sic) was to

be pursued and further gave advice to Motley and others as to the propriety of the arrest of plaintiff." (*Id.* at ¶ 113). The Court declines Metz's broad invitation to hold that advice provided by a prosecutor to an investigator as to how to pursue an investigation or as to the propriety of an arrest constitutes "the professional evaluation of the evidence assembled." (Def's Br., Dkt. # 23, at 14). Just as in *Prince*, Plaintiff alleges that Metz gave Motley legal advice prior to the existence of probable cause and prior to Motley's testimony to the magistrate that initiated criminal proceedings against Plaintiff. Considering Plaintiff's Complaint in the light most favorable to Plaintiff, Metz was not acting as an advocate for the state in so advising Motley. *Prince*, 198 F.3d at 613-15. Accordingly, Metz is not entitled to absolute immunity in this function either.

### c.    Initiating Plaintiff's Prosecution

Finally, though he makes absolutely clear that the above-referenced "functions were separate and distinct from his prosecutorial functions which may have included making determinations as to the appropriateness of charging plaintiff and preparing paperwork for submission to the court," Plaintiff's Complaint also sets forth facts related to the prosecutorial process. (Plf's Am. Compl., Dkt. # 18, at ¶ 114). He, for example, asserts that Metz avoided interviewing Plaintiff "to obtain additional facts necessary *to [make] an informed decision to prosecute.*" (*Id.* at ¶ 116(b)) (emphasis added). Plaintiff also asserts

that "[h]ad the investigation been performed in good faith and in a legitimate attempt to uncover the truth, the prosecution never would have been initiated." (*Id.* at ¶ 117). Accordingly, Plaintiff summarily concludes that Metz "may also have conspired with Defendant Motley to provide false information to the court at that (sic) time of the issuance of the warrant for plaintiff's arrest." (*Id.* at ¶ 118).

These functions clearly relate to the decision to prosecute, to which absolute immunity absolutely applies. *Burns*, 500 U.S. at 484 (prosecutors have absolute immunity from "suits for malicious prosecution and . . . this immunity extend[s] to the knowing use of false testimony before the grand jury and at trial"); *Buckley*, 509 U.S. at 274 n. 5 (acknowledging that absolute immunity shields "a prosecutor's decision to bring an indictment, whether he has probable cause or not"); *Spurlock*, 330 F.3d at 797 ("[P]rosecutors are absolutely immune from many malicious prosecution claims.").

### 3. Plaintiff's Complaint Fails to Identify Any Actions Taken By Metz That Are Outside the Scope of Prosecutorial Immunity

As to those remaining "functions" to which absolute immunity does not apply, Metz asserts that qualified immunity applies in the alternative. This Court need not address this argument, however, as "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 842 n. 5 (1998) (citation omitted). Upon

review of Plaintiff's Amended Complaint, it is clear that Plaintiff's alleged injuries

attributable to Metz arise out of his prosecution for attempted fraud against the

state -- not any investigative misconduct independent of the prosecution.   As

indicated above, there is no doubt that Metz is absolutely immune for any role he

played in Plaintiff's prosecution.   In order for Plaintiff's lawsuit against Metz to

proceed, therefore, he must link his malicious prosecution claims to the

investigation in order to avoid absolute immunity.

"To succeed on a malicious-prosecution claim under § 1983 when the claim

is premised on a violation of the Fourth Amendment, a plaintiff must prove the

following:"

> First, the plaintiff must show that a criminal prosecution was initiated
> against the plaintiff and that the defendant made, influenced, or
> participated in the decision to prosecute.  Second, because a § 1983
> claim is premised on the violation of a constitutional right, the
> plaintiff must show that there was a lack of probable cause for the
> criminal prosecution.   Third, the plaintiff must show that, as a
> consequence of a legal proceeding, the plaintiff suffered a deprivation
> of liberty, as understood in our Fourth Amendment jurisprudence,
> apart from the initial seizure.  Fourth, the criminal proceeding must
> have been resolved in the plaintiff's favor.

*Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010) (internal citations,

quotations, and alternations omitted).   The elements of a malicious prosecution

claim under Michigan law are slightly different:

> To make out a case of malicious prosecution under Michigan law, the
> plaintiff has the burden of proving (1) that the defendant had initiated
> a criminal prosecution against him, (2) that the criminal proceedings

28

> terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

*Alman v. Reed*, 703 F.3d 887, 902 (6th Cir. 2013) (citing *Matthews v. Blue Cross & Blue Shield of Michigan*, 456 Mich. 365 (1998)) (quotations and alterations omitted). Plaintiff's problem, however, is that he has not alleged that Metz violated his Constitutional and Michigan Common law rights when Metz engaged in functions not covered by absolute immunity.

Just like the line delineating prosecutorial conduct protected by absolute immunity from conduct that is not is difficult to draw, so too is the line between prosecutorial immunity and stating a claim for relief. In *Buckley*, which involved an allegation that a prosecutor fabricated evidence during his investigation, the Supreme Court articulated this similar line-drawing problem:

> As we have noted, the *Imbler* approach focuses on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful. *The location of the injury may be relevant to the question whether a complaint has adequately alleged a cause of action for damages.*

*Buckley*, 509 U.S. at 271-72 (emphasis added); *see also id.* at 274 n.5 ("[T]he dissent's distress over the denial of absolute immunity for prosecutors who fabricate evidence regarding unsolved crimes . . . seems to conflate the question whether a § 1983 plaintiff has stated a cause of action with the question whether

the defendant is entitled to absolute immunity for his actions.").  Justice Scalia

fleshed out this point in his concurrence:

> [M]any claims directed at prosecutors, of the sort that are based on acts not plainly covered by the conventional malicious-prosecution and defamation privileges, are probably not actionable under § 1983, and so may be dismissed at the pleading stage without regard to immunity--undermining the dissent's assertion that we have converted absolute prosecutorial immunity into "little more than a pleading rule," I think petitioner's false-evidence claims in the present case illustrate this point.   Insofar as they are based on respondents' supposed knowing *use* of fabricated evidence before the grand jury and at trial -- acts which might state a claim for denial of due process -- the traditional defamation immunity provides complete protection from suit under § 1983.  If "reframe[d] . . . to attack the preparation" of that evidence, the claims are unlikely to be cognizable under § 1983, since petitioner cites, and I am aware of, no authority for the proposition that the mere preparation of false evidence, as opposed to its use in a fashion that deprives someone of a fair trial or otherwise harms him, violates the Constitution.

*Id.* at 281 (Scalia, J, concurring) (internal citations omitted and alterations in

original).

A trio of more recent decisions address this pleading dichotomy and support

the dismissal of Plaintiff's claims against Metz.  First, take the Sixth Circuit's

decision in *Koubriti v. Convertino*, 593 F.3d 459 (6th Cir. 2010), a case that spun-

off from the so-called "Detroit Sleeper Cell" matter over which this Court

presided.  *See U.S. v. Koubriti*, 336 F. Supp. 2d 676 (E.D. Mich. 2004) (Rosen, J.).

In *Convertino*, the defendant was the Assistant United States Attorney responsible

for successfully prosecuting Koubriti on terrorism-related charges.  *Convertino*,

593 F.3d at 463.  As it turned out, Convertino was successful in the criminal case largely because he utterly failed to turn over exculpatory materials and misled the Court, the jury, Koubriti and the other Defendants "as to the nature, character and complexion of critical evidence that provided important foundations for the prosecution's case." *Koubriti*, 336 F. Supp. 2d at 681.

After a lengthy post-verdict investigation ordered by the Court, the Court vacated the convictions, and Koubriti then filed a *Bivens* action, alleging that Convertino violated the Fifth Amendment "by maliciously and intentionally withholding exculpatory evidence and fabricating evidence contrary to *Brady v. Maryland*, 373 U.S. 83, 87 (1963)." *Convertino*, 593 F.3d at 469-70.  As pertinent here, Koubriti alleged that Convertino did not disclose that the government could not establish the location of certain sites depicted in suspicious drawings in a day planner allegedly tied to Koubriti.  *Id.* at 462, 466.  In finding that the district court erred in not granting Convertino absolute immunity as to this allegation, the Sixth Circuit held that this was "nothing more than an accusation that Convertino failed to disclose exculpatory evidence" and that it is clear that "prosecutors have absolute immunity from civil liability for the non-disclosure of exculpatory information at trial."  *Id.* at 467-68 (*citing Imbler*, 424 U.S. at 431 *and Jones v. Shankland*, 800 F.2d 77 (6th Cir. 1986)).

31

In an attempt to distance himself from this general rule, Koubriti argued that Convertino's *investigation* produced the exculpatory evidence, which therefore negated absolute immunity. *Id.* at 468. The Sixth Circuit rejected this argument:

> Koubriti attempts to distinguish his claim by focusing on the circumstances surrounding the *acquisition* of the alleged exculpatory information produced by Convertino's investigation instead of the actual non-disclosure of the information. In his brief to this court, Koubriti highlights the fact that Convertino traveled to Jordan some fifteen months before the trial began and investigated the buildings allegedly depicted in the day planner sketches. The district court, in agreeing with Koubriti, stated that "immunity cannot extend to actions by a prosecutor that violate a person's substantive due process rights by obtaining, manufacturing, coercing or fabricating evidence before filing formal charges, even if the subsequent use of that evidence is protected by absolute immunity." *The argument made by Koubriti and the district court fails to recognize that Koubriti is not requesting relief for some alleged violation that took place during Convertino's trip to Jordan. There is nothing in the complaint to suggest that Koubriti is arguing that he is entitled to relief here because of some due process violation Convertino committed while he investigated the case in Jordan.* That would be a different claim. . . . Instead, what we have in the instant case is an allegation that relies on *Brady--a case dealing with the non-disclosure at trial of exculpatory information-- and is based on the non-disclosure of a pertinent fact, not the underlying investigation itself. There is no claim here of evidence fabrication, and it is not the evidence that resulted from the trip of which Koubriti complains.*

> * * *

> The very same policy reasons undergirding the Supreme Court's decision in *Imbler* also counsel in favor of recognizing absolute immunity here. Since prosecutors are almost always involved with the police's investigation of crimes, denying absolute immunity in cases such as this would likely "eviscerate" the absolute immunity in traditional non-disclosure claims that the Supreme Court has already decided to protect. Likewise, it would "weaken the adversarial

system" and interfere with prosecutorial discretion much in the same way that caused the *Imbler* Court to rule in favor of granting immunity.   *Since Plaintiff's claim (and underlying harm) is only related to the non-disclosure and not the underlying investigation, the* Imbler *and* Jones *dispositions lead us to the conclusion that Convertino has absolute immunity from this claim.*

*Id.* at 468-69 (emphasis added and internal citations omitted).

Instructive here as well is *Bianchi v. McQueen*, 917 F. Supp. 2d 822 (N.D. Ill. 2013), in a case alleging that state special prosecutors abused their positions by bringing criminal charges against Illinois State Attorneys as part of a "politically motivated conspiracy."   *Id.* at 825.   As pertinent here, the plaintiffs claimed that these special prosecutors manufactured evidence as it related to allegations that the plaintiffs engaged in official misconduct, such as having staff perform political work, theft/misappropriation, and giving benefits in criminal prosecutions to friends, relatives, and supporters.   *Id.* at 825-26.   The special prosecutors presented this manufactured evidence and other false statements to a grand jury, which ultimately resulted in criminal charges against the plaintiffs.   These charges were eventually dismissed and plaintiffs instituted litigation against the special prosecutors, alleging, among other claims, false arrest under 42 U.S.C. § 1983.   *Id.* at 827.

In dismissing plaintiffs' false arrest claim, the court refused to connect the allegations of participating in a "sham" investigation to the Plaintiffs' alleged

33

constitutional injury.  Because similar factual issues are at play in this case, the

Court extensively quotes Judge Dow's opinion in *Bianchi*:

> Plaintiffs were arrested after they were indicted by a grand jury and
> warrants were issued based on the indictments.  McQueen cannot be
> liable for false arrest if Plaintiffs were arrested because of witness
> testimony or his presentation of witness testimony before the grand
> jury.  A prosecutor's conduct before a grand jury is absolutely
> immune. . . . *Of course, if a prosecutor manufactured incriminating
> evidence while investigating a case, presented that manufactured
> evidence to the grand jury, and the grand jury returned an indictment,
> he could not claim absolute immunity for what he did during the
> investigation.  A judicial proceeding does not automatically immunize
> misconduct that happened before it.  But, by the same token, just
> because a prosecutor was involved in a case in an investigatory role
> does not mean that he is deprived of immunity for what he did as a
> prosecutor.*
>
> * * *
>
> In this case, at least for Plaintiffs' false arrest claims, *the only
> allegations against McQueen are that he interviewed witnesses and
> reviewed . . . reports of interviews with witnesses and that those
> witnesses and [others] testified and produced documents to the grand
> jury.*  McQueen, too, is alleged to have testified before the grand jury.
> The claim is therefore that (1) witnesses gave false or misleading
> testimony to the grand jury that included rumor, hearsay, and
> manufactured and/or fabricated evidence, (2) *that testimony* persuaded
> the grand jury to issue an indictment, and (3) that indictment caused
> an arrest.  *Plaintiffs' false arrest claim against McQueen thus is an
> attack on grand jury testimony and a prosecutor's conduct before a
> grand jury (as a witness and a lawyer).  This is not a case where a
> prosecutor is claiming immunity for investigatory conduct just
> because it was part of a series of events that led to a judicial
> proceeding.  Here, it is plainly conduct at a judicial proceeding--
> grand jury testimony--that Plaintiffs claim caused their injuries
> related to the allegedly false arrest.*

34

In order to find that the indictment, and so the arrest, was improper, the Court would have to scrutinize grand jury transcripts and decide whether witnesses (including McQueen) perjured themselves before the grand jury.  That, however, is precisely what the Court cannot do in deciding a claim for money damages against a prosecutor. Especially following the Supreme Court's recent decision in *Rehberg* [*v. Paulk*, 132 S. Ct. 1497 (2012)]*,* the Court is not persuaded by Plaintiffs' argument that they are seeking damages for a conspiracy to present false testimony or a conspiracy to prepare witnesses to give false testimony. . . .  That does not immunize all preparation or turn all investigation into preparation.  *But that is not what is going on here. Here, the relevant allegations are that evidence was presented to a grand jury and that the evidence was reviewed before it was presented.  Plaintiffs cannot "reframe" their challenge to (allegedly) false or repudiated grand jury testimony by pointing to alleged misconduct at the outset of the investigation.  It was not the mere existence of an investigation that caused Plaintiffs' arrest; testimony before the grand jury did that.*

*Plaintiffs have not stated a plausible claim that improper actions by McQueen outside the scope of his duties as a prosecutor infected the grand jury proceedings and so somehow caused Plaintiffs' arrests.* One more time, recall the alleged causal chain.  Amy Dalby, an SAO employee, shared confidential documents with Bianchi's Republican primary opponent and the media.  Bianchi got a special prosecutor appointed.   Dalby was investigated and eventually pled guilty to computer tampering.  Dalby then petitioned Judge Graham to appoint a special prosecutor to investigate Bianchi, alleging that he abused his position at the SAO.  Judge Graham granted Dalby's petition and appointed Tonigan and McQueen as special prosecutors.  Tonigan and McQueen interviewed Dalby and others and asked for Judge Graham to expand the scope of their investigation.  Judge Graham granted that request, and there were more interviews and documents produced.  A grand jury convened and witnesses (including McQueen) appeared before it.  The grand jury indicted Plaintiffs, and the indictments led to their arrests.  Where is McQueen's misconduct outside his role as a prosecutor (or before the grand jury)? Plaintiffs point to the Tonigan letter [that "contained blatantly false statements" to Judge Graham requesting to expand the investigation] through which they allege that Tonigan and McQueen manipulated Judge Graham to have their

35

> mandate expanded. But that did not cause Plaintiffs' arrests. At most,
> that led to interviews, and those interviews did not violate the Fourth
> Amendment. Plaintiffs (quite properly) are not claiming a right not to
> be investigated or talked about. Individuals were interviewed and
> then testified before the grand jury. In the context of this case at least,
> interviewing a witness before his or her testimony before a grand jury
> is conduct within the scope of McQueen's role as a prosecutor and so
> is absolutely immune. Testimony before the grand jury is absolutely
> immune. And, as has long been the rule, a prosecutor's conduct
> before a grand jury is absolutely immune.

*Id.* at 830-32 (emphasis added and internal citations omitted).

Finally, both the procedural history and language from the Supreme Court's

recent decision in *Rehberg* ultimately drives home this Court's conclusion. The

*Rehberg* plaintiff sued a district attorney, a specially-appointed prosecutor, and an

investigator alleging various § 1983 claims -- including one for malicious

prosecution -- relating to being indicted three separate times for different charges

that the state court eventually dismissed. As applicable here, the plaintiff lodged

complaints concerning prosecutorial misconduct during the pre-indictment

investigation, as set forth by the Eleventh Circuit:

> Hodges [the District Attorney] and Paulk [the Chief Investigator],
> acting as investigators, got together as a favor to the hospital, with
> malice and without probable cause, and made up a story about
> Rehberg, and then Paulk (at Hodge's direction) told that fake story
> under oath to the grand jury, leading to Rehberg's indictment and
> arrest.

*Rehberg v. Paulk,* 611 F.3d 828, 840 (11th Cir. 2010). The Eleventh Circuit

concluded that absolute immunity barred the plaintiff's claims, reasoning that

"[s]ince Paulk receives absolute immunity for his false testimony before the grand jury, Hodges and Paulk are similarly immune for their alleged conspiracy to fabricate and present false testimony to the grand jury." *Id.* at 841 (*citing, inter alia, Jones v. Cannon*, 174 F.3d 1271 (11th Cir. 1999) ("To allow a § 1983 claim based on subornation of perjured testimony where the allegedly perjured testimony itself is cloaked in absolute immunity would be to permit through the back door what is prohibited through the front.")).  The Eleventh Circuit also noted that in contrast to other cases involving prosecutorial misconduct during investigations,

> there is no allegation of any physical or expert evidence that Hodges or Paulk fabricated or planted.  There is no allegation of a pre-indictment document such as a false affidavit or false certification.  Rather, Hodges and Paulk are accused of fabricating together only the testimony Paulk later gave to the grand jury.  No evidence existed until Paulk actually testified to the grand jury.  Stated differently, the only evidence Rehberg alleges was fabricated is Paulk's false grand jury testimony, for which Paulk receives absolute immunity.

*Id.* at 841-42.

Though the prosecutor's absolute immunity was not appealed to the Supreme Court, the investigator's was.  The Supreme Court affirmed the Eleventh Circuit on this point, again applying the familiar "functional approach." *Rehberg*, 132 S. Ct. at 1501-03.  Concluding that grand jury witnesses "should enjoy the same immunity as witnesses at trial," *id.* at 1506, the Supreme Court reinforced the public policy implications underpinning the Eleventh Circuit's holding concerning

37

immunity for engaging in a conspiracy to present false testimony before a grand

jury:

> [T]his rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution. Were it otherwise, "a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." In the vast majority of cases involving a claim against a grand jury witness, the witness and the prosecutor conducting the investigation engage in preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony. We decline to endorse a rule of absolute immunity that is so easily frustrated.

*Id.* at 1506-07 (internal citations omitted).[6] *See also Grant v. Hollenbach*, 870

F.2d 1135, 1138-40 (6th Cir. 1989) (prosecutors absolutely immune from claims of

conspiring to bring false charges, failing to investigate, and falsely obtaining an

indictment).

Here, as with the plaintiffs in *Convertino*, *Bianchi*, and *Rehberg*, Plaintiff

seeks respite from absolute immunity in the fact that Metz participated in an

investigation before his arrest. But the malicious prosecution claims set forth in

his Amended Complaint make clear that he is seeking relief as a result of his

---

[6] To be sure, the Supreme Court made a distinction in *Rehberg* between a witness's testimony before a grand jury and that of a "complaining witness" who, like Motley, are law enforcement officials who submit affidavits in support of applications for an arrest warrant. *Id.* at 1507-09. This is a distinction without a difference given that the scope of Motley's potential immunity is not at issue at this time.

prosecution.   Accordingly, Plaintiff has not stated any claim to which absolute prosecutorial immunity does not apply.   Plaintiff's claims against Metz must be dismissed.   *See also Grant*, 870 F.2d at 1138-39 ("This is not a case in which the prosecutor allegedly violated plaintiff's or another's constitutional rights through actual investigation."); *Cheolas*, 2009 WL 388548, at *8-9 ("Although the allegations in support of count II make reference to activities -- most notably, the fabrication of evidence -- that are more investigative in nature, and therefore may not be shielded by absolute immunity, nothing in the complaint forges . . . a link between these sorts of activities and the Defendant prosecutors.   Rather, as to these Defendants, Plaintiffs allege only that they brought criminal charges and continued to prosecute despite the lack of probable cause or sufficient evidence, and that they plea bargained in bad faith.   As explained earlier, the Defendant prosecutors enjoy absolute immunity from liability for any federal § 1983 claims arising from such activities.").

## IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant Metz's Motion to Dismiss [Dkt. # 23] is GRANTED.

**IT IS SO ORDERED.**


Dated:        March 3, 2014                    s/Gerald E. Rosen
                                              GERALD E. ROSEN
                                              CHIEF, U.S. DISTRICT COURT


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, March 3, 2014, by electronic and/or ordinary mail.

                                              s/Julie Owens
                                              Case Manager, 313-234-5135