UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**JOHN C. BUCHANAN, JR.**,

Plaintiff,

No. 12-CV-15511

vs.                                                                 Hon. Gerald E. Rosen

**JAMES W. METZ II** and **DONOVAN
MOTLEY**,

Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This civil rights litigation arises out of Plaintiff John C. Buchanan, Jr.'s involvement in attempting to redevelop a manufacturing plant into a film studio and claim a credit under Michigan's Film and Digital Media Tax Credit program. When the project was not approved by the Michigan Film Office, which was in charge of assessing claims under the program, the State initiated an investigation against Plaintiff and several of his associates, eventually resulting in criminal charges against Plaintiff. A Michigan state court subsequently dismissed those charges for want of probable cause. Plaintiff has now brought a cause of action in

1

this Court, asserting claims under the Fourth Amendment and Michigan common law for malicious prosecution and false arrest. Plaintiff targets those claims against Defendants James W. Metz II, a former Special Agent with the Department of Attorney General, and Donovan Motley, an Assistant Attorney General assigned to litigate the case on behalf of the state. Plaintiff's complaints largely focus on his assertion that Metz and Motley decided to pursue charges against Plaintiff without probable cause and effectuated this by having Motley make false statements to a magistrate.

Both Defendants have now moved for summary judgment, asserting that there was probable cause to bring the charges, and that they are entitled to either qualified, absolute, or governmental immunity. Having reviewed and considered the Defendants Motions and supporting briefs, Plaintiff's response briefs, and the entire record of this matter, the Court has determined that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Therefore, the Court will decide this matter "on the briefs." See Eastern District of Michigan Local Rule 7.1(f)(2). The Court's Opinion and Order is set forth below.

2

## II. PERTINENT FACTS

**A.      Michigan's Film and Digital Media Tax Credit**

This case arises out of the State of Michigan's tax incentives for the film industry.  In 2008, the State Legislature enacted the "Film and Digital Media Tax Credit," which permits investors to claim a tax credit "for an investment in a qualified film and digital media infrastructure project . . . equal to 25% of the taxpayer's base investment."  M.C.L. § 208.1457(1-2) (effective April 8, 2008).[1] The Michigan Film Office oversees the issuance of these credits, with the concurrence of Michigan's Treasurer.  § 208.1457(1).  A "qualified film and digital media infrastructure project" includes production and postproduction facilities, property and equipment related to the facility, and "any other facility that is a necessary component of the primary facility."  § 208.1457(11)(d).  Importantly, the tax credit defines a "base investment" as:

> [T]he cost, including fabrication and installation, paid or accrued in the taxable year of tangible assets of a type that are, or under the internal revenue code will become, eligible for depreciation, amortization, or accelerated capital cost recovery for federal income tax purposes, provided that the assets are physically located in this state for use in a business activity in this state and are not mobile tangible assets expended by a person in the development of a qualified film and digital media infrastructure project.  Base investment does not include a direct production expenditure or qualified personnel

---

[1] After the events at issue in this lawsuit, Michigan significantly changed its film industry tax credit program.

expenditure eligible for a credit under [a different provision of Michigan's film incentive, § 208.1455].

§ 208.1457(11)(a).

## B.   The Development of the Lear Plant into a Film Production Facility

### 1.   Alpinist and West Michigan Films Agree To Redevelop the Lear Plant

In 2006, Plaintiff had a discussion with his father, Jack Buchanan, Sr., in which he convinced Buchanan Sr. to enter into a business deal in which the two would purchase a former manufacturing plant just outside of Grand Rapids commonly known as the "Lear Plant" or "Hangar 42." Motley Interview with Jack Buchanan Sr., Dkt. # 67-9, at 1. To facilitate the transaction, the two formed Alpinist Endeavors, LLC ("Alpinist") a limited liability company jointly co-owned by the two. *Id.* They purchased the property for $4.2 million. *Id.* Plaintiff and his father had originally planned to sell the building, and according to Buchanan Sr., they had several interested purchasers ready to buy the property for $7 million, but Plaintiff believed they could make more money, leading to tension between Plaintiff and his father. Eventually, Plaintiff, without the input of his father, sought to find an investor to convert units 4 and 5 of the Lear Plant (the "Property") into a permanent film studio, which could enable Plaintiff to take advantage of the Film and Digital Media Tax Credit. *See id.* at 1-2; *see also* Pl.'s Compl, Dkt. # 49, at ¶¶ 15-21). In 2009, Plaintiff met with Joseph Peters, an unemployed individual who

4

had previously interacted with Plaintiff, and the two came to an agreement that Peters would form and own a company called West Michigan Films, LLC ("WMF"), which would purchase the Property for $40 million. *See* Peters Dep., Dkt # 69-6, at 9-15; Pl.'s Compl., Dkt. # 49, ¶ 21(a). This initial plan was formed unbeknownst to Buchanan Sr., who did not find out about WMF until November 2009.[2]

### 2.    The Tax Credit Application

Prior to Buchanan Sr.'s discovery of the plan, WMF filed an "Application and Agreement for Infrastructure Development Film and Digital Media Incentives" with the MFO on November 2, 2009. Application, Dkt. # 66-9. The application included a business plan, describing a "state of the art film production facility" with a floor area "in excess of 400,000 square feet" and projecting employment of up to 975 individuals. *Id.* at 2. The plan included a construction estimate of $23.72 million that would be necessary to convert the property to a "turnkey ready" film studio. Budget, Dkt. # 66-9. Further, the application contained a purchase agreement, signed by Plaintiff and Joseph Peters, executed on October 28, 2009, that purported to demonstrate a transfer of units 4 and 5 of the Lear Plant from Alpinist to WMF. Purchase Agreement, Dkt. # 66-10. The agreement

---

[2] Plaintiff had, however, been in talks with Buchanan Sr.'s attorney since May 2009 regarding the possibility of Plaintiff buying out his father's share in Alpinist. May 19, 2011 email, Dkt. # 67-9.

contained a condition precedent stating that "Buyer shall not be obligated to close the transaction . . . unless the following conditions shall have each been met prior to the closing . . . Buyer shall have obtained a commitment for a Michigan Film Infrastructure Tax Credit of no less than $10,000,000." *Id.* at 5-6.  In November 2009, the MEDC, the Michigan Film Office, and the Treasurer apparently provided a preliminary approval for WMF's application, subject to further examination of the Property.  Pl.'s Compl., ¶¶ 30, 34.[3]

Following the submission of the application, the MFO interacted primarily with Peters, as the applicant and purchaser of the property designated to become the film studio.  Peters's primary contact point was Janet Lockwood, the Film Commissioner of the MFO during the period of the WMF application.  Peters also had frequent communication with Penny Launstein, an employee at the Michigan Economic Development Corporation (MEDC), which assisted the MFO in evaluating applications under the tax policy.  Though both Launstein and Lockwood appeared to understand that they were communicating only with Peters and two other individuals aiding Peters and Plaintiff in the application process (who will be discussed below), Plaintiff sometimes ghostwrote communications for Peters, composing entire emails to Launstein and Lockwood, signed with Peters's name.  For example, in one communication from Peters to Launstein

---

[3] Plaintiff does not appear to provide supporting documentation of this approval, but Defendant does not contest this claim in its briefing.

describing the improvements that Alpinist was to make to the property prior to closing, Plaintiff wrote "we're not sure what the Seller's improvements are, but it's obviously a very big number."  Studio Rehab Costs email, Dkt. # 67-12, Ex. E. Between the November 2009 application and the eventual May 2010 denial of the application, Launstein and Lockwood had dozens of communications with Peters, seeking final confirmation of WMF's purchase of the property, details regarding the improvements that were to be made to turn the property into a film studio, the costs of those improvements, and other information.  *See, e.g.*, Launstein Dep., Dkt. # 69-4, at 136-45; Peters Dep., Dkt. # 69-6, at 25-30.  During this process, the Film Office repeatedly asked to conduct their own appraisal of the building to determine whether the $40 million purchase price was reasonable, and also asked for a detailed list of improvements made to the property in furtherance of turning it into a film studio, as well as invoices for those improvements.  Peters Dep., at 25-30.  Plaintiff had access to dozens of such invoices, *see* Invoices, Dkt. # 68-7, but when Peters requested that they turn those invoices over to the Film Office, Plaintiff refused, Peters Dep., at 26-30.

Following the initial application to the MFO, Buchanan Sr. learned of, and approved of, the plan to redevelop the plant.  Buchanan Sr. stated that in November (after the initial application, including the purchase agreement, had been filed), his attorney informed him that his son and Peters had made an agreement to develop

the Property into a film studio.  May 19, 2011 email from Jack Buchanan to Donovan Motley, Dkt. # 67-9.  At the time, Buchanan Sr. had been working with potential buyers of units 3 and 4 -- the two units included in the MFO application. *Id.*  Buchanan Sr. "still did not consider this deal with [his] son and Joe Peters viable until they sent [him] . . . a copy of an executed tax credit approval form signed by Janet Lockwood."  *Id.*  Buchanan Sr.'s attorney "verified with Joe Peters that the approval form was the final step before issuance of the tax credits and there were no contingencies remaining," and Buchanan Sr. then "entered into an agreement with [Plaintiff] to sell [his] interest in the property . . . for $3.2 million." *Id.*  Buchanan Sr. then "learned, for the first time . . . that before the state actually issued the credits, certain improvements had to be made to the property in order to make it an official operating film studio."  *Id.*[4]

### 3.    Other Individuals Involved in the Deal

Three other individuals associated with Plaintiff were involved in the application process.  First, Plaintiff recruited Brice Bossardet, whom Plaintiff knew from various construction and development projects.  Bossardet Aff., Dkt. # 67-12, ¶ 2.  Bossardet assisted in creating the business plan that was attached to the November 2, 2009 application.  *Id.* ¶¶ 2-4.  Bossardet had anticipated that investors

---

[4] As discussed below, Buchanan Sr. and Plaintiff eventually reached an agreement by which Buchanan Sr. would sell his interest in Alpinist to Plaintiff, had the tax credit application ever been fully approved.

would be brought in to secure funding for the necessary improvements to the property, but over time, he came to the conclusion that Peters and Plaintiff "did not intend to make the $20 million of enhancements that we had discussed as necessary to convert the Property into a state-of-the-art turnkey film studio." *Id.* ¶ 5. Eventually, Bossardet became disillusioned with the plan, based on, as he characterized it, Plaintiff's "effort to draft/create statements for others to them make/present" and because of Plaintiff's "loose or cavalier approach" to the tax credit procedure." *Id.* ¶¶ 7-8. After a dispute with Plaintiff over a separate construction project, the two had a falling out and Bossardet ceased working on the Lear Plant project. *Id.* ¶¶ 9-11.[5] As discussed below, Bossardet later proved critical in triggering the investigation leading to this litigation by reporting the alleged misconduct to the media.

Second, Plaintiff recruited Noah Seifullah, who was a legislative aid to then-House Representative Robert Dean. According to Bossardet, Seifullah was to be a part owner of the studio and would be paid a salary. Bossardet claims that when he

---

[5] Bossardet also asserts that Plaintiff "threatened [him] and told [him] not to say anything about [Plaintiff] or his role in the tax credit effort, Joe Peters or their tax credit application." Id. ¶ 11. Bossardet also asserts that Plaintiff "threatened [him] at a meeting [they] had in approximately November, 2010" and that "even as late as last summer" when Bossardet "happened to run into [Plaintiff] at a mall in Grand Rapids," Plaintiff "threatened [him] and [his] family." *Id.* There is no independent evidence of any such threats, aside from a July 1, 2010 email that Plaintiff sent to Bossardet discussing Bossardet's hesitancy with the project and stating that "[w]e remain deeply concerned but encourage you not to do anything further you'll regret." July 1, 2010 email, Dkt. # 67-12, Ex. H.

objected to Seifullah being paid a salary for his assistance, Plaintiff stated that he would pay Seifullah himself. *Id.* ¶ 6.   As Bossardet put it, Seifullah's role appeared to be that of an outside official lobbying on behalf of a project that would benefit Rep. Dean's constituency. *Id.*[6]   Though Seifullah was to benefit financially from his role in the project, there is some evidence that Plaintiff and his group attempted to make him appear disinterested.   For example, in one email chain between Plaintiff, Seifullah, and Peters, Plainitff ghostwrote an email for Peters to send to Lockwood regarding the status of modifications to the Property, sale of the Property, and appraisal.  In a response where Peters suggested Seifullah respond on some of these points, Plaintiff replied, "the reason we thought it should come from you is because you rep WMF.  You would know those points better than anyone since you're the applicant and it should appear like your [sic] fighting for the project and time is critical.  Noah probably needs to be a little more independent." March 20, 2010 email, Dkt. # 68-6.  There is no evidence in the record that anyone at the MFO or MEDC knew about Seifullah's connection to or communication with Plaintiff or Peters.

Third, Plaintiff sought the assistance of Dennis Weiss, a CPA who had previously worked with Plaintiff through Alpinist.  Weiss assisted Plaintiff and his

---

[6] The record includes a letter, signed by Rep. Dean, that was drafted by Seifullah and sent to the MFO pressuring the office to move forward on the WMF application.  April 21, 2010 letter from Robert Dean to Janet Lockwood, Dkt. # 67-4.

group with various aspects of the project, including an audit of the value of the property. As Weiss testified in his deposition in this matter, Plaintiff attempted to have several appraisals of the Property done,[7] and when discussing Weiss's audit, he "wanted the value to be $40 million." Weiss Dep., at 189. Weiss further stated that Plaintiff asked him "Do you think two or three of your accountant buddies would audit the West Michigan Film turnkey sale? Do you think all would relate to it . . . [that] it's pretty clear and simple that the price's eligible per the statute and approved application?" *Id.* at 191; *see also* March 26, 2010 email, Dkt. # 66-4. Weis eventually sent a letter to the MFO and MEDC stating that he had "reviewed the closing statements and title work . . . [and] determined that the qualifying costs for . . . the project are $40,000,000 and said costs are qualified infrastructure costs as outlined and mandated within the requirements of the film and digital media tax credit."[8] As with Seifullah, the Court has not identified any evidence indicating that the MFO or MEDC was aware that Weiss stood to gain from the project being approved for the tax credit.

### 4.    The Redevelopment Plan Falls Apart

---

[7] The Property was appraised by Doug Adams, as discussed in more detail below regarding Motley's affidavit in support of probable cause.

[8] Weiss also later answered "no" to the question, "Did you actually do any analysis or calculation to be the person that came up with that $40 million dollar number for the initial application document?" Weiss Dep., at 319.

Communications between the MFO and MEDC continued into early 2010. On February 2, 2010, Plaintiff and his father entered into a "Redemption Agreement," by which Buchanan Sr. agreed to sell the Property to Plaintiff for $3.2 million and gave Plaintiff permission to sell the property to WMF.[9] Redemption Agreement, Dkt. # 84-2. All that remained to finalize the deal between Plaintiff and his father was payment of the $3.2 million. May 19, 2011 email from Jack Buchanan to Donovan Motley, at 2.

On March 2, 2010, Peters submitted an Investment Expenditure Certificate (IEC) form to Lockwood. That form represented that the project was "complete," that $40 million had been expended, that 500-700 jobs had been "created," the project had been "audited," and that the property had been "purchased" by WMF. IEC From, Dkt. # 66-11. None of these statements were true at the time, as Plaintiff still lacked the ability to sell the Property without final approval from his father. Peters Dep., at 162-65, Weiss Dep., at 101. Also attached to the IFC form was a letter from Weiss similarly stating, "I have reviewed and audited the project verifying completion and quantification of costs. The audit of the project consisted of physical review of the facilities, title work, and closing documentation . . . . The applicant purchased the facility as a 'turnkey' digital media and film studio for $40,000,000. The cost incurred by the applicant qualifies as infrastructure costs;

---

[9] Both parties agree to this interpretation of the Redemption Agreement.

12

applicant qualifies for $10,000,000 in Infrastructure Credits."   March 2, 2010 letter, Dkt. # 67-8.

On April 5, 2010, Plaintiff and Peters executed various agreements purportedly closing the sale of the Property from Alpinist to WMF.   Closing Documents, Dkt. # 66-6.  For reasons that are not entirely clear to the Court, Peters assigned his interest in WMF to Seifullah.   *Id.* at Document # 1.  This assignment was never disclosed to the MFO.  Seifullah then executed an agreement appointing Peters as authorized agent for WMF.   *Id.* at Document # 3.  Peters then, on behalf of WMF, executed a land contract granting the Property to WMF for a purchase price of $40 million.   *Id.* at Document # 4.  At least as far as the Court can surmise, this meant that only Peters's name appeared on documents that would be filed with the MFO, and not Seifullah's name.

Though the dealings between Plaintiff, his father, Peters, Seifullah, and Weiss had finally reached a conclusion satisfactory to all, the application before the MFO was not so successful.  On May 23, 2010, the MFO made the decision not to finalize the tax credit.  Plaintiff asserts that the project's downfall began when "politics intervened."   Pl.'s Compl. ¶ 37.[10]  Specifically, various individuals and

---

[10] The Republican primary for governor in the summer of 2010 was occurring during this time.   Plaintiff contends that then-gubernatorial candidate Representative Pete Hoekstra called for a criminal investigation into the matter as "a political ploy . . . to make . . . [gubernatorial competitor] Attorney General Cox . . . either investigate or seem soft on fraud."  Pl.'s Compl., ¶ 87).

organizations began questioning the veracity of the project's $40 million base investment price, when it had previously been listed for sale a few months before for less than $10 million and had not undergone $30 million in improvements. *Id.* at ¶¶ 52, 77, 94; *see also* Motley Report of Interview with Janet Lockwood, Dkt. # 67-1, Ex. A., at 3 ("As a result of Mr. Peters' failure to provide the additional documentation [of the improvements to the Property] as well as concerns that the information contained in the application was not accurate, . . . . Ms. Lockwood and the Michigan Film Office denied Mr. Peters' application."). As Plaintiff puts it, individuals in the MFO and MEDC felt that, based on the totality of communications with Plaintiff and his team, "was inflated purely to get the tax credit." *Id.* at ¶ 52.[11] Plaintiff, having never paid his father the agreed-upon $3.2 million price to acquire Buchanan Sr.'s interest in Alpinist, never secured the Property. *See* Notice of Recission, Dkt. # 68-4. Buchanan Sr. eventually began

---

[11] Other individuals shared this view. In an April 14, 2010 email from Buchanan Sr. to his attorney, Robert Nolan, Buchanan Sr. speculated that Plaintiff would not be able to secure the tax credit and stated, "Why are we just learning now about the muck raking and its effect on the State issuing the tax credits[?] . . . The asking price for the property has been a matter of public record for years. The real problem is that they tried to pull a fast one on the state by telling them that they we paying 40M for the property to get the 10M in tax credits. The State apparently approved the credits based on that lie until they were tipped off by the Mac Center and investigated. They got caught. They also tried to fool them by making all those improvements, but that backfired when Lookwood (sic) wanted to see the invoices." April 14, 2010 email from Jack Buchanan Sr. to Robert Nolan, Dkt. # 67-5.

14

marketing the property to other individuals for sale or lease. Motley Interview with Jack Buchanan, Sr., at 2. There is no evidence in the record, that any improvements to turn the Property into a "turnkey" film studio were ever made, aside from a few minimal "system upgrades." *See* May 4, 2010 email from Plaintiff to Joeseph Peters and Noah Seifullah, Dkt. # 68-1.

## C.   Plaintiff's Arrest and Prosecution

### 1.   The Investigation

The Lear Plant application received significant media and public attention. Pl.'s Compl., ¶¶ 46, 47, 50, 61, 81-83. One individual with close ties to media in Grand Rapids sent at least one "whistleblower email" asserting that the project was a fraud to state legislators and various advocacy groups opposing tax credits. *Id.* ¶ 45. On June 17, 2010, the Department of Attorney General began investigating Plaintiff and Peters for potential fraud in their pursuit of the tax incentive.[12] The case was assigned to Defendant Motley, then a Special Agent with the Department of Attorney General, and Defendant Metz, an Assistant Attorney General. *See* Motley Aff., Dkt. # 67-1, ¶ 2. The investigation proceeded fairly rapidly. During June and July, Motley met with a number of witnesses, including Buchanan Sr. and his attorney. On August 2, 2010, the day before the Republican gubernatorial

---

[12] Plaintiff focuses heavily on the potential political motives of the investigation, but provides no ties between those potential motives and Motley's or Metz's behavior. *See* Pl.'s Resp. to Motley's Mot. For Summ. J., at 3-6.

primary, the Attorney General's Office announced that it was filing criminal charges against Peters for attempted fraud on the state.  Press Release, Dkt. # 84-10.

The investigation against Plaintiff continued following the charges against Peters.  On October 27, 2010 Metz prepared an internal memorandum, called a "Request to Initiate Litigation," which was circulated among various officers in the Office of Attorney General.  October 27, 2010 Request to Initiate Litigation, Dkt. # 67-6.  In that memorandum, Metz detailed much of the factual background described above, and sought charges of "one count of Attempted False Pretenses $20,000 or more, and one count of Conspiracy to do the same."  *Id.* at 3.  At least two officials within the Office agreed that probable cause was present and signed off on the request, Thomas C. Cameron Dep., Dkt. # 69-1, at 9, 93, in addition to Division Chief for the Criminal Division David Tanay, who also supported filing the charges, *id.* at 25.  But as the Office was undergoing a change in administrations, approval was delayed.  Metz submitted a largely identical second request on January 19, 2011.  January 19, 2011 Request to Initiate Litigation, Dkt. # 67-7.  That request was approved by two more individuals, *id.* at 130-40, and on January 25, 2011, Motley appeared before a magistrate, presented a sworn affidavit with facts uncovered during the investigation, and requested a warrant for

Plaintiff's arrest on similar charges.  Donovan Motley Aff., Dkt. # 67-10.  The magistrate granted this request.  Pl.'s Compl., ¶ 105.

### 1.    The Affidavit

Pertinent to these Motions, Motley's affidavit citied three main evidentiary bases that Motley thought gave rise to probable cause for a charge of false pretenses under Michigan law.  First, the affidavit stated that Peters's application to the MFO was filed "prior to any evidence of an ownership interest belonging to" Peters, and falsely indicated, through letters from Weiss, that Peters had already purchased the property, as discussed above.  Donovan Motley January 25, 2011 Aff., Dkt. # 67-10, ¶¶ 1, 3, 7, 9.

Second, the affidavit stated that "[Plaintiff] arranged for an appraisal of [the Property] which came in at a value of $45 million dollars (as was suggested by [Plaintiff])."  *Id.* ¶ 4.  This statement was based primarily on an interview that Motley had with Doug Adams, who appraised the property.  As Motley recalls that visit in his affidavit in the instant case,

> One of the witnesses with whom I met, and from whom I obtained information, was Doug Adams, an appraiser. I met Mr. Adams several times at his office, obtained documents from him, and attended his investigative subpoena deposition. During one of my visits with Mr. Adams at his office, Mr. Adams mentioned to me that he had discussed with Mr. Buchanan Jr. a $40 million land contract that Mr. Adams relied upon in part for his 2010 opinion of value. At that meeting, *Mr. Adams told me that Mr. Buchanan Jr. told him that the 2010 appraisal should be for no less than $40 million*.

Donovan Motley Jan. 21, 2015 Aff., ¶ 10 (emphasis added).  When deposed for this case, Adams stated that he didn't think Motley had ever asked him a question regarding Plaintiff's influence over the appraisal.  Doug Adams Dep., Dkt. # 69, at 80-81.  However, Adams testified that he could not recall the conversation well enough to know whether Motley was lying in his affidavit.  *Id.*  Adams also testified in his deposition that Plaintiff had told him about the $40 million land contract with WMF and that the amount did have an effect on his assumption about sufficient demand for the Property.  *Id.* at 79.  Adams had previously appraised *all units* of the Lear Plant (not just units 4 and 5, which were involved in the film studio project) at just over $8 million.  *Id.* at 32.  This appraisal involved an extra 40 percent of the building that was not appraised in 2010 when Plaintiff hired Adams to appraise only units 4 and 5.  *Id.* at 33.  The only apparent improvements to the Property between those two assessments were some system upgrades that Alpinist had made.  May 4, 2010 email from Plaintiff to Joeseph Peters and Noah Seifullah, Dkt. # 68-1.   Tanay, who conducted the investigative deposition of Adams, stated that he "left the investigative . . . interview of Mr. Adams with the unmistakable impression that [Adams] got the message [of Plaintiff's desired appraisal amount] and was playing ball."  David Tanay Dep., Dkt. # 69-8, at 44-45.

As explained in his briefing, Motley also relied on a number of other indicators that the appraisal value was bogus, such as Plaintiff's discussions with

Weiss as detailed above regarding the audit of the property and Plaintiff's refusal to provide documentation of improvements made to the Property.  He also relied on the opinion of Jay Riggs, another appraiser who toured the site in 2010.  Riggs testified at his deposition that when he toured it, it was not in the condition of a film studio, and that a fair value for units 4 and 5 would be in the $8-12 million price range.  Jay Riggs Dep., Dkt. # 69-7, at 46-48.

Third, the affidavit stated that Plaintiff "signed a Memorandum of Land Contract as seller indicating that he had sold the property to Joseph Peters.  He did this knowing he did not have the authority to sell the property.  [Plaintiff] did not have the authority to sell or transfer the property without the consent of [his father]."  Donovan Motley January 25, 2011 Aff., ¶ 8.  Motley relied on the above description of Plaintiff's and his father's respective authority over the Property in making this statement.

After Plaintiff's booking and subsequent release on bond, the state district court held preliminary examinations in May, July, and September 2011, and eventually dismissed the charges against Plaintiff and Peters for lack of probable cause, stating that "looking at the entire context of the interaction between the defendants,   their   representatives,   the   State . . . [and]   the   surrounding circumstances, I simply am not convinced that there was ever an intentional

19

misrepresentation made by either [Peters or Buchanan]."  Probable Cause hearing

transcript, Dkt. # 84-15, at 31.

**D.      Plaintiff's Claims**

On December 17, 2012, Plaintiff filed a civil suit in this Court, asserting

claims of malicious prosecution and false arrest under both the Fourth Amendment

and state law against both Motley and Metz.  Plaintiff's claims are largely based on

assertions that Motley's affidavit to the magistrate, which resulted in the granting

of an arrest warrant, contained various false statements, and that Defendants lacked

probable cause to charge Plaintiff with false pretenses.

**1.      The Problems with Motley's Affidavit**

Plaintiff claims that Motley presented untrue statements to the magistrate,

which were "material to the issuance of the arrest warrant."  Pl.'s Compl., ¶ 114.

As pertinent here, Plaintiff notes that the affidavit provided that "Plaintiff arranged

for an appraisal in which he suggested and insisted that the appraiser value the

facility in excess of $40 million[] and that the appraisal relied in part upon the $40

million sales price as part of the rationale for the final opinion of value."  *Id.* ¶ 107.

In asserting that this statement was false at the time Motley provided the affidavit,

Plaintiff relies on several facts.  First, he notes that at his deposition, Adams did

not recall being pressured by Plaintiff regarding his appraisal price.  Further, he

asserts facts implying that Motley's suspicions about the Property not being worth

20

$40 million were off base. He notes that Buchanan Sr. stated that while the property was not worth more than $10 million as an industrial property, it could be worth $50-60 million as a film studio, and Motley knew this based on his interview with Buchanan Sr. Motley Interview with Jack Buchanan Sr., Dkt. # 67-9, at 2. He also points to a Progressive Insurance appraisal that Motley possessed during the investigation that valued the building at approximately the same amount Adams's appraisal did, stating that the cost to replace the building entirely would have been around $40 million. Donovan Motley Dep., Dkt. # 83-13, at 76-78.

Second, Plaintiff claims that the affidavit "falsely suggested that Mr. Buchanan had a CPA falsify the transaction by stating that the property had been sold." *Id.* ¶ 96. Similarly, the affidavit claimed "that there was no intent to sell because [Plaintiff] did not have the ability to transfer title." *Id.* ¶ 111. Plaintiff claims that Metz and Motley "knew that this statement was false and misleading because they had in their possession at the time the agreements and e-mails among Mr. Buchanan, his father, and Alpinist's attorney." *Id.* ¶ 112. Plaintiff supports these statements with various communications during the application process, focusing on the fact that after the initial application filed by Peters with the MFO, Buchanan knew about the application and had formed various agreements with Plaintiff to sell his interest in the Property if the tax credits were acquired. Plaintiff focuses especially on the Redemption Agreement, discussed above, which Motley

21

knew about and agreed gave Plaintiff the authority to sell the Property to WMF after its effective date of February 2, 2010. Donovan Motley Dep., at 102. Plaintiff also notes that Weiss stated in his deposition that it was Peters, not Plaintiff, who drafted the letter stating that the property had been sold, and Motley was present during this statement. *Id.* at 45-46; Dennis K. Weiss Dep., Dkt. # 82-3, at 11-12.

Regarding the allegations that Plaintiff and Peters had falsely indicated that the Property had already been purchased by WMF, Plaintiff points to various communications between Lockwood and Peters, which Motley possessed during the investigation, including from Peters to Lockwood on February 1, 2010, and March 4, 2010, stating that the closing had not yet occurred and the property was not yet sold. *Id.* at 135-45; see also March 4, 2010 emails between Janet Lockwood and Joe Peters, Dkt. # 82-6 (discussing potential closing of the Property).

### 2.  Metz's Involvement

In his complaint, Plaintiff also made a number of separate allegations against Defendant Metz, asserting that Metz was involved in the investigative process by gathering documents and recording statements of individuals. Pl.'s Compl, ¶¶ 95-96. The record indeed indicates that Metz was involved in various aspects of the investigation, and Metz does not challenge this on Summary Judgment. Further,

22

Plaintiff provides evidence, and Metz does not dispute, that Metz had access to much, if not all, of the factual background of the case, leading up to Metz's first Request to Initiate Litigation.

Plaintiff's Complaint also alleges that "defendant Metz also may have given advice to the defendant Motley concerning how the investigation was to be pursued and further gave advice to Motley and others as to the propriety of the arrest of plaintiff, or ordered the arrest in the absence of probable cause." *Id.* ¶ 97. The Complaint further alleges that "Defendant Metz may also have conspired with Defendant Motley to provide false information to the Court at that (sic) time of the issuance of the warrant for plaintiff's arrest." *Id.* ¶ 102. There does not, however, appear to be any evidence in the record that Metz was so involved in either the decision to order the arrest of the Plaintiff or any alleged decision to provide false information when seeking issuance of an arrest warrant.

## E.     Procedural History

This litigation has had a protracted history, with a number of procedural and discovery motions. Pertinent to these summary judgment motions is Defendant Metz's Motion to Dismiss, which this Court granted on March 3, 2014. Dkt. # 36. In that Motion, Metz asserted that he was entitled to absolute prosecutorial immunity with regard to his role in the case. *See generally* Metz Mot. to Dismiss, Dkt. # 23. The Court agreed in part, holding that Metz was entitled to absolute

23

immunity with his regard to prosecutorial functions, including his role in initiating charges against Plaintiff.  Dkt. # 36, at 26-27.  The Court also held, however, that any actions taken by Metz that involved investigation into Plaintiff's alleged misconduct, including the giving of advice to Motley and collection of evidence, were not covered by absolute immunity.  *Id.* at 23-25.  Ultimately, however, the Court found that Plaintiff failed to allege any federal claims that were not covered by prosecutorial immunity, because any investigative role taken by Metz only harmed Plaintiff "as a result of his prosecution."  *Id.* at 38-39.  Accordingly, the Court dismissed all federal claims against Metz.  *Id.* at 39.

Plaintiff, however, then filed a Motion for Reconsideration, as well as an amended complaint.  Dkt. # 48.  In his amended complaint, Plaintiff asserted that in addition to harming him as a result of his prosecution, the investigation itself, prior to any formal charges being filed, harmed his business interests.  Opinion and Order Regarding Plaintiff's Mot. for Reconsideration, Dkt. # 48, at 8-10.  The Court held that while Plaintiff had still failed to make out a federal substantive due process claim against Metz for any participation in a "sham investigation," *id.* at 13-20, the new allegation of injury  allowed him to make out a claim of false arrest against Metz based on the allegations that Metz "falsely advised Motley that probable cause existed to arrest Plaintiff, or ordered his arrest in the absence of

probable cause" and "[gave] advice to defendant Motley concerning how the investigation was to be pursued." *Id.* at 21-22.

Accordingly, the Second Amended Complaint, in its final form, makes out four claims against Defendants: false arrest in violation of the Fourth and Fourteenth Amendments against both Defendants (Count I), malicious prosecution in violation of the Fourth and Fourteenth Amendments against Motley (Count II), state law malicious prosecution against Motley (Count IV),[13] and state law false arrest against both Defendants (Count V).

Both Defendants have now moved for summary judgment, asserting that they are entitled to qualified immunity, absolute immunity (in the case of Metz), and governmental immunity (with regard to the state claims).  Dkt. ## 66, 71. Metz has also moved for partial summary judgment on the issue of damages, asserting that Plaintiff's damages claims -- which include the benefit of the tax credit that Plaintiff asserts he would have received if not for the investigation against him -- "go beyond fantasy or good faith advocacy."  Dkt. # 72, at 2.  The issues have been fully briefed, and the Court may now properly address the Motions.  Because many of the counts overlap substantially with regard to each

---

[13] Plaintiff improperly numbered the Counts in his Complaint, neglecting to include a Count III.  Because the parties briefed the claims using the incorrect numbers, the Court does as well, for ease.

Defendant, the Court addresses the claims against Defendant Motley first, followed by the claims against Defendant Metz.

## III. DISCUSSION

### A.    Standard of Review

Through their present motions, both Defendants seek summary judgment in their favor pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Under that Rule, summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In addition, where a moving party seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted).

26

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). But, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

**B.    Analysis**

    **1.    Claims Against Defendant Motley**

        **a.    Fourth Amendment False Arrest and Malicious Prosecution Claims (Counts I and II)**

First, Plaintiff alleges that Defendant Motley is liable for both false arrest and malicious prosecution, in violation of the Fourth and Fourteenth Amendments. Plaintiff's theory for both claims is the same: he claims that Motley based his arrest on a warrant that was obtained as a result of misleading the magistrate judge by presenting false testimony in his affidavit and by omitting evidence from the investigatory file. Plaintiff also asserts that Motley lacked probable cause to make an arrest. Pl.'s Compl., ¶¶ 123-24 (false arrest claim), 139 (malicious prosecution claim).

27

The charges at issue here were based on attempted false pretenses under M.C.L. § 750.218(5). As defined in that statute, the elements for the crime are (1) "attempting," (2) "with the intent to defraud or cheat" and (3) mak[ing] or us[ing] a false pretense to" obtain money or an item of value. M.C.L. § 750.218. In his Motion for Summary Judgment, Motley asserts that, regarding the federal claims, probable cause was present to make a charge of attempted false pretenses and conspiracy to the same, and that he is entitled to qualified immunity. The standards under qualified immunity in this arena are well-defined:

> Qualified immunity shields government officials acting within the scope of their official duties from civil liability insofar as their conduct does not violate clearly established rights of which a reasonable person would have known. The purpose of the qualified immunity defense is to protect public officials from undue interference with their duties and from potentially disabling threats of liability.

*Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003) (internal quotation marks omitted). The bar for the plaintiff is not an easy one to pass: "[t]he qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). As the Supreme Court has repeatedly articulated, qualified immunity is assessed using a two-step process:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's

> alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009).   After *Pearson*, judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

Though the legal standards for false arrest and malicious prosecution under the Fourth Amendment differ slightly, both turn on the question of whether the determination of probable cause was reasonable here. "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005). "An arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest." *Id.* However, a Plaintiff may still recover in such circumstances where she is able to show "by a preponderance of the evidence: (1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000); *see also Vakilian*, 335 at 517 (citing *Wilson* with approval and applying a materially identical standard). If the affidavit contains false statements or material omissions, the court

must set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause. *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989).

Malicious prosecution is "a separate constitutionally cognizable claim . . . under the Fourth Amendment," which "encompasses wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir. 2006) (internal quotation marks omitted). The tort "remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process." *Wallace v. Kato*, 549 U.S. 384, 390 (2007) (internal quotation marks omitted). As with a Fourth Amendment false arrest claim, a Fourth Amendment malicious prosecution claim often turns on whether it was reasonable for an officer to believe that probable cause was present:

> To succeed on a malicious-prosecution claim under § 1983 when the claim is premised on a violation of the Fourth Amendment, a plaintiff must prove the following: First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute. Second, because a § 1983 claim is premised on the violation of a constitutional right, the *plaintiff must show that there was a lack of probable cause for the criminal prosecution*. Third, the plaintiff must show that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure. Fourth, the criminal proceeding must have been resolved in the plaintiff's favor.

*Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010) (emphasis added).

As applicable to both false arrest and malicious prosecution under the Fourth Amendment, "[p]robable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc) (internal quotation omitted). A determination of probable cause in qualified immunity analysis must be looked at by examining the totality of the circumstances. When determining whether an officer had probable cause, a court must examine "whether it was 'clearly established that the circumstances with which [the officers were] confronted did not constitute probable cause' for purposes of the Fourth Amendment." *Legenzoff v. Steckel*, 564 F. App'x 136, 141 (6th Cir. 2014) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). Especially in the qualified immunity context, this is a fact specific analysis that requires examination of past cases to determine whether an officer should have known that the circumstances presented would or would not give rise to probable cause. *E.g,* *Anderson v. Creighton*, 483 U.S. 635, 640-41 (1987); *Legenzoff v. Steckel*, 564 F. App'x at 141 (finding, in a case involving a probable cause determination base on a photo array, that "we are assessing whether it was clearly established that a reasonable officer would not find probable cause where several eyewitness identified a defendant using a possibly suggestive photo array")

Examining the totality of the evidence in this factually complex case, the Court cannot say that a reasonable juror could find that no reasonable officer in Motley's position would have thought there was probable cause to make an arrest. First, regarding the alleged false representations that Plaintiff and Peters made to the MFO that WMF had purchased the Property at the time of the application, Plaintiff does properly point out that communications between Peters, Lockwood, and Launstein sometimes provided indications that the MFO and MEDC knew, at various points, or at least believed, that Alpinist had not yet sold the property to WMF. But this does not change the fact that in the very first document Peters sent to the MFO, he included a purchase agreement that unequivocally indicated that the property had already been sold. It also does not change the fact that Plaintiff, Peters, and their associates were consistently misleading and resistant to the MFO's requests, further providing reason to believe that fraud may have been afoot. Indeed, Launstein, who was intimately involved with the tax application process, stated that she had formed the opinion that the involved parties had committed fraud against the state that would lead to criminal charges. *See* Penny Launstein Dep., Dkt. # 69-4, at 10.

It is, of course, true that Motley did not provide to the magistrate *all* of the evidence that could lead one to believe that -- despite the numerous misrepresentations that Plaintiff, Peters, and their associates made to the MFO --

Lockwood and the MFO knew the real story that Plaintiff had no authority to sell the property until the February agreement with his father and that Alpinist retained possession of the property all along.  But even if all of that information had been made clear in the affidavit, the Court cannot say that this would have negated any reasonable finding of probable cause.  At bottom, the many indications of deception on the part of Plaintiff, Peters, and their associates provided substantial reason for Motley to be leery of Plaintiff's representations.

The same is true as to Plaintiff's argument that Motley's statements in the affidavit that the $40 million appraisal value was a sham did not provide the full picture.  While the evidence that Plaintiff points to may sow reasonable doubt as to whether the appraisal was fraudulent, reasonable doubt is not the standard that an office must abide by when making a reasonable determination of probable cause -- especially in the context of a qualified immunity analysis of whether that defense shields the officer.  Significant evidence cited by Defendants provides good reason to be skeptical about the legitimacy of the value of the Property.  The Court finds no reason to infer that Motley was malicious in presenting the evidence, and even accounting for all of the evidence provided by Plaintiff, the Court again cannot say

that it was clearly established that no reasonable officer would have thought probable cause was present.[14]

Importantly, this was an extraordinarily complex investigation, resulting in thousands of pages of documents and testimony. The evidence is such that it is easy to come to opposite conclusions regarding the intent of Plaintiff and his associates, as well as the extent to which their conduct was fraudulent. Indeed, such a factual record is exactly the type of situation where it is difficult to say that it was "clearly established" that the circumstances did not give rise to probable cause, even when taking Motley's affidavit and adding to it all of the evidence that Plaintiff cites. Critically, Plaintiff has utterly failed in identifying caselaw with a

---

[14] Plaintiff asserts that "The Attorney General needed evidence to show that Buchanan and Peters did not intend to deliver a film studio upon receipt of the tax credits." Pl.'s Resp. to Motley's Mot. for Summ. J., Dkt. # 82, at 14. So long as Plaintiff intended that the Property would eventually be used for the purpose envisioned by the Film and Digital Media Tax Credit statute, Plaintiff argues, it does not matter if he made false representations with the intent to mislead the MFO along the way. In support of this, Plaintiff relies on dicta in *People v. McCoy*, 254 N.W.2d 829 (Mich. Ct. App. 1977), stating that an intent to defraud is not necessarily "established as soon as any part of the transaction was revealed as being tainted by a falsehood." *Id.* at 834. But even so, Plaintiff could have intended to defraud the MFO in violation of the statute even if he ultimately intended to deliver the film studio by securing the tax credit by unlawful means in derogation of the statute (i.e., by misrepresenting the purchase status of the property) or by falsifying information so as to receive an inflated tax credit. But regardless of the proper interpretation, qualified immunity does not require Motley to understand this debatable nuance in the law of attempted false pretenses when making a difficult probable cause determination in a factually dense case -- this lack of clarity is exactly the type of pitfall that qualified immunity allows officers to avoid with regard to personal liability.

factual background anywhere close to this one that could provide some evidence that it was clearly established that the instant circumstances did not give rise to probable cause. Plaintiff relies primarily on *Sykes v. Anderson*, a 2010 case in this Circuit in which three female victims of a robbery, one of whom was three months' pregnant, were charged with staging the robbery themselves, despite video-surveillance evidence clearly showing all three as victims during the robbery. 625 F.3d at 300-02. After a jury found the arresting officers liable for false arrest, malicious prosecution, and violation of the plaintiffs' due process rights, the officers appealed. In affirming the liability decision, the Sixth Circuit described the numerous reasons that a reasonable juror could conclude that probable cause was lacking. *Id.* at 305, 310-12. That case is not especially helpful here, primarily because it is factually entirely distinct from this case, and thus does not articulate the clearly established law with regard to probable cause in circumstances like this one. But *Sykes* is also inapposite because that case *did not involve qualified immunity* -- the officers there had waived the defense by failing to assert it prior to the case being submitted to the jury. *Id.* at 304. Aside from baseline principles of probable cause in the false arrest/malicious prosecution context, *Sykes* is of little help here, and Plaintiff fails to point the Court to other, more on-point authorities, though the Court recognizes that cases like this one are unique.

In sum, although this case presents circumstances in which probable cause was perhaps debatable, particularly since Motley clearly did not provide all of the evidence that he could have -- and perhaps should have -- in his affidavit to the magistrate, even by viewing the evidence in the light more favorable to Plaintiff, the Court cannot say that a reasonable juror could find that *no reasonable officer* would have thought probable cause was present, that such a determination was clearly established at the time the warrant was sought, or that Motley maliciously and recklessly falsified information or intentionally or recklessly misled the magistrate. Qualified immunity requires that police investigations be reasonable, not perfect. While Officer Motley's decision to proceed may have been open to question, it was not unlawful.

### b. State Law False Arrest and Malicious Prosecution Claims (Counts IV and V)

Plaintiff also alleges that Defendant Motley is liable for both false arrest and malicious prosecution under state law, based on the same theory as his Fourth Amendment complaints.[15] The analysis of these claims is similar to that of Plaintiff's Fourth Amendment claims, though there are some slight differences. While qualified immunity provides officers a shield from liability for federal

---

[15] As with the Fourth Amendment claims, state law false arrest and malicious prosecution claims depend on a showing that there was no probable cause for the defendant's actions. *See, e.g.*, *Brewer v. Perrin*, 349 N.W.2d 198 (Mich. Ct. App. 1984) (false arrest); *Young v. Barker*, 405 N.W.2d 395 (Mich. Ct. App. 1987) (malicious prosecution).

constitutional torts, in Michigan, the related doctrine of governmental immunity provides officers a shield from liability for state-law intentional torts. The Sixth Circuit has recently articulated the modern version of that test, which has been reaffirmed by the Michigan Supreme Court on several occasions:

> In *Odom v. Wayne County*, 760 N.W.2d 217, 228 (Mich. 2008), the Michigan Supreme Court stated that the proper method for determining whether governmental immunity applies to intentional torts, such as assault and battery, is to apply the test set forth in *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 647 (Mich. 1984). Under the *Ross* test, an employee enjoys a right to immunity if (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the employee undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature. Defendants bear the burden of establishing their entitlement to immunity from plaintiff's state-law claims.

*Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011) (citations omitted). Importantly, regarding the good-faith element of governmental immunity, "[u]nlike qualified immunity under federal law, which uses an objective standard, '[t]he good-faith element of the *Ross* test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.'" *Id.* (quoting *Odom*, 760 N.W.2d at 229) (second alteration in original). Still, as Plaintiff notes, the question of good faith under governmental immunity often "overlaps considerably, if not entirely, with [the qualified immunity] analysis of whether [an]

officer's actions were objectively reasonable under the circumstances." *Malory v. Whiting*, 489 F. App'x 78, 86 (6th Cir. 2012).

Plaintiff appears to concede that Motley was acting in the course of his employment as an investigator during all of the events alleged here, and likewise makes no argument that any of Motley's actions were ministerial in nature.[16] Accordingly, the only remaining issue is whether Motley was acting in good faith. In his cursory argument on this point, Plaintiff relies entirely on his qualified immunity argument that "the lack of probable cause was palpable" and that Motley "didn't act as a reasonable investigator should have to review the whole file to form a reasonable and honest belief." Pl.'s Resp. to Motley's Mot. for Summ. J., at 13. As discussed above, the Court is not persuaded by this argument, and further, the court finds no evidence in the record that Motley acted with malicious intent or without good faith. While the decision to seek an arrest warrant was perhaps aggressive, the Court finds that Motley has brought forth sufficient evidence demonstrating his "honest belief and good-faith conduct" in the investigation. *See Odom*, 760 N.W.2d at 229. Accordingly, Motely is entitled to governmental immunity against Plaintiff's state-law intentional tort claims.

**2.  Liability of Defendant Metz**

**a.  Fourth Amendment False Arrest Claim (Count IV)**

---

[16] Indeed, neither party addresses either of these two points in their briefs.

As with Defendant Motley, Plaintiff brings a claim of false arrest against Defendant Metz. The Court has addressed this claim in some detail in response to Metz's earlier Motion to Dismiss (Dkt. # 23) and Plaintiff's Motion for Reconsideration and Motion for Leave to File a Second Amended Complaint (Dkt. # 38). As with those Motions, Metz asserts that he is entitled to absolute immunity from Plaintiff's Fourth Amendment claim, as, he argues, Plaintiff has not brought forth any evidence adducing Metz's wrongful conduct in the investigation outside of his prosecutorial role.

This Court previously outlined the standard for absolute immunity in detail in its Opinion and Order granting Metz's Motion to Dismiss:

> "State prosecutors are absolutely immune from civil liability when acting within the scope of their prosecutorial duties." *Howell v. Sanders*, 668 F.3d 344, 349 (6th Cir. 2012) (citing *Imbler v. Pachtman*, 424 U.S. 409 (1976)). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991). Prosecutorial immunity flows from the common-law and "is based upon the same considerations that underlie the common-law immunities of judges and gran[d] jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler*, 424 U.S. at 422-23. "Although absolute immunity 'leave[s] the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty,' 'the broader public interest' would be disserved if defendants could retaliate against prosecutors who were doing their duties." *Adams v. Hanson*, 656 F.3d 397, 401-02 (6th Cir. 2011) (alteration in original) (citing *Imbler*).

39

> The key to determining whether a prosecutor is entitled to absolute immunity requires analyzing whether the prosecutor's alleged activities "were intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. If so, then a prosecutor is absolutely immune from liability, even for egregious conduct such as "the knowing use of false testimony and the suppression of material evidence at [a] criminal trial." *Spurlock v. Thompson*, 330 F.3d 791, 797 (6th Cir. 2003) (*citing Imbler*). There are limits to this broad rule. "[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Instead, courts are to apply a "'functional approach,' which looks at 'the nature of the function performed, not the identity of the actor who performed it.'" *Id.* at 269 (internal citation omitted). "[T]he critical inquiry is how closely related is the prosecutor's challenged activity to his *role as an advocate* intimately associated with the judicial phase of the criminal process." *Spurlock,* 330 F.3d at 798. (internal quotation marks and citation omitted).

Opinion and Order Granting Defendant Metz's Motion to Dismiss, Dkt. # 36, at 15-17. Based on this governing law, the Court found that Metz was not entitled to absolute immunity for any investigative acts that violated Plaintiff's rights, such as falsifying evidence, but was entitled to absolute immunity for any functions relating to the decision to prosecute Plaintiff, including "making determinations as to the appropriateness of charging plaintiff." *Id.* at 26-27.

Although a close call in this post-*Twombly* legal era,[17] out of an abundance of caution and a desire to allow Plaintiff to attempt to develop a factual predicate

---

[17] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That watershed case significantly raised the bar for sufficient pleading by making clear that factual allegations in the complaint, accepted as true, "must be enough to raise a right to

for his case, the Court allowed the claim to move forward on Plaintiff's amended complaint based on Plaintiff's allegations that "Metz and Motley orchestrated his [Plaintiff's] by having Motely falsely testify before the magistrate" and that Metz "falsely advised Mr. Motley that probable cause existed to arrest Plaintiff, or ordered his arrest in the absence of probable cause." Opinion and Order Regarding Pl.'s Mot. for Reconsideration, at 21. However, now that discovery has been completed, the Court finds it clear that Motely has failed to adduce sufficient evidence to survive summary judgment on the claim.

Plaintiff describes in painstaking detail Metz's role in the investigation, as noted above in the factual background. *See* Pl.'s Resp. to Metz's Mot. for Summ. J., Dkt. # 80, at 1-7. And indeed, it is clear that Metz took some part in the investigation of this matter, and he is not entitled to absolute immunity for any unlawful conduct he undertook during that investigation. But critically, Plaintiff does not point to *any* unlawful acts that Metz performed when taking an investigative rule. Instead, Plaintiff repeatedly argues that Metz "misunderstood the law and misreported the facts," *id.* at 7, "ignored evidence," *id.* at 10, "misrepresented" evidence, *id.* at 17, and "falsely accused" Plaintiff, *id.* at 20, *all*

---

relief above the speculative level," and must "state a claim to relief that is plausible on its face." *Id.* at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

*in Metz's request to initiate litigation.* What Plaintiff still fails to recognize, however, is that he cannot avoid the bar of absolute immunity with regard to actions taken in Plaintiff's prosecutorial role, as this Court has already explained in previous orders. Plaintiff makes no allegation of wrongdoing in the *actions Metz took when investigating the case*; instead he alleges that Metz misinterpreted that evidence when providing memoranda to his superiors *requesting to initiate litigation*. But Metz is clearly entitled to immunity with regard to any wrongful conduct associated with his request to initiate litigation, as such an act clearly falls within his prosecutorial role. [18]

Other allegations in Plaintiff's Complaint that are independent of Metz's Request to Initiate Litigation could make out a legitimate claim of false arrest if supported by evidence. As the Court previously noted, had Metz falsely advised to Motley that probable cause existed, ordered Plaintiff's arrest in the absence of probable cause, or conspired with Metz to falsify evidence or undertake a sham investigation, Plaintiff could make out a legitimate claim of false arrest against Metz. However, as Metz persuasively argues, there is simply no evidence in the record that that Metz ever advised Motley as to the existence of probable cause or otherwise conspired with him to provide false evidence. Accordingly, the Court

---

[18] In the alternative, the Court notes that even if Metz were *not* entitled to absolute immunity on these allegations, he certainly would be entitled to qualified immunity, for the reasons described above with regard to Defendant Motley.

finds that Metz is entitled to summary judgment with regard to Plaintiff's Fourth Amendment false arrest claim against him.

### b.    State Law False Arrest Claim (Count IV)

Finally, Plaintiff alleges that Metz is liable for false arrest under state law, based on the same general theory under which he alleges Motley is liable under state law.  The analysis here proceeds the same as it did there.  Plaintiff does not contend that Metz was acting outside of the scope of his employment during the alleged acts, nor does he allege that any of Metz's actions were ministerial in nature.  As with the state-law charges against Motley, the only question is whether Metz was acting in good faith.  And, as with Motley, the Court finds no evidence of malicious behavior or ill will on the part of Metz.  His decision to seek charges against Plaintiff was clearly open to debate as to whether probable cause existed, but this did not rise to the level of malicious behavior that would not be entitled to governmental immunity. Accordingly, Metz is entitled to summary judgment on Plaintiff's state-law claim of false arrest against him.

# IV. CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant Motley's Motion for Summary Judgment (Dkt. # 66) is **GRANTED**.

IT IS FURTHER ORDERED that Defendant Metz's Motion for Summary Judgment (Dkt. # 71) is **GRANTED**.

IT IS FURTHER ORDERED that Defendant Metz's Motion for Partial Summary Judgment (Dkt. # 72) is **DENIED AS MOOT**.

IT IS FURTHER ORDERED that Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

Dated:  September 14, 2015                 s/Gerald E. Rosen
                                           Chief Judge, United States District Court


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 14, 2015, by electronic and/or ordinary mail.

                    s/Julie Owens
                    Case Manager, (313) 234-5135